# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

JACQUELINE DE BRITTO BUCCO, et al.,

        Plaintiffs,

vs.

WESTERN IOWA TECH COMMUNITY COLLEGE, et al.,

        Defendants.

No.  C21-4001-LTS

**MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTIONS TO DISMISS**

## I.  INTRODUCTION

This case is before me on motions (Docs. 31, 32, 35 and 39) to dismiss filed by defendants Premier Services, Inc. d/b/a J&L Enterprises and d/b/a J&L Staffing and Recruiting (J&L) and Nancy Albrecht[1] (together, the J&L defendants); Tur-Pak Foods, Inc. (Tur-Pak); Royal Canin USA, Inc. (Royal Canin); and Julie Albert, Rosana Salgado Burright, Lilly Castro, Terry Murrell, Terry Yi, James Zuercher and Western Iowa Tech Community College (WITCC) (together, the WITCC defendants).  Plaintiffs have filed a resistance (Doc. 58) to the motions with separate briefs as to each set of defendants. *See* Docs. 59, 60, 61, 62.  Defendants have filed replies.  *See* Docs. 68, 73, 74, 75.  Oral argument is not necessary.  *See* Local Rule 7(c).

## II.  FACTUAL ALLEGATIONS

The following allegations from the First Amended Complaint (FAC) (Doc. 15) are accepted as true for purposes of the motions to dismiss:

---

[1] Albrecht was a J&L employee at all material times.  *See* Doc. 15 at ¶ 19.

Plaintiffs are citizens of Brazil[2] and participants in the J-1 visa program at WITCC. This program was represented to plaintiffs as a two-year program in which they would study at WITCC and complete internships related to their field of study at no more than 32 hours per week. After plaintiffs arrived in the United States, they were assigned jobs at either the Royal Canin or Tur-Pak plants. Royal Canin manufactures high-end pet food and Tur-Pak packs and assembles food products. Plaintiffs allege these jobs: (1) had no educational value, (2) were completely unrelated to their intended fields of study and (3) required working more than 32 hours a week. They allege defendants told them if they were unable to work due to illness, they would be removed from the visa program and sent home. They state Royal Canin and Tur-Pak paid $15 per hour for the labor plaintiffs provided, yet plaintiffs received only $7.25 per hour. The rest of their earnings went to WITCC and J&L. Plaintiffs were enrolled in classes at WITCC but were segregated from the general student population and took classes only with other Brazilians and Chileans who were part of the visa program.

In November 2019, the United States Department of State investigated the visa program at WITCC. On November 19, 2019, it interviewed several students participating in the program. After these interviews, plaintiffs were prohibited from working at Royal Canin and Tur-Pak. Because they were no longer working, plaintiffs did not have money to buy food and WITCC instructed the students to utilize local food pantries. WITCC ended the visa program in January 2020 and asked the students to vacate student housing in February and March of 2020.

The FAC describes circumstances unique to each of the 10 individual plaintiffs including how they heard about the visa program, their intended fields of study, representations made to them about the program by WITCC representatives, where they

---

[2] Plaintiff Nestor Alonso Acevedo Contreras was not a citizen of Brazil, but he has voluntarily dismissed his claims against defendants without prejudice. *See* Doc. 24.

2

worked, the nature of their work, their hours and pay and when they left WITCC housing. *See* Doc. 15 at 6-16. Plaintiffs allege the following claims:

- Count I – Forced labor and trafficking for forced labor under the Trafficking Victims Protection Reauthorization Act (TVPRA), including violations of 18 U.S.C. §§ 1581, 1589, 1590, 1595 (against all defendants)

- Count II – Violations of 29 U.S.C. § 201, Fair Labor Standards Act for unpaid overtime wages (against defendants Royal Canin and Tur-Pak)

- Count III – Violations of the Iowa Wage Payment Collection Law (against defendants Royal Canin and Tur-Pak)

- Count IV – Violation of the Racketeer Influenced and Corrupt Organizations act (RICO), 18 U.S.C. § 1962 (against all defendants)

- Count V – Conspiracy to commit violations of RICO, 18 U.S.C. § 1962 (against all defendants)

- Count VI – Violation of the 13th Amendment (against all defendants)

- Count VII – Denial of right to procedural and substantive due process under the Iowa State Constitution Article I, § 9 (against all defendants)

- Count VIII – Fraudulent misrepresentation (against all defendants)

- Count IX – Negligent misrepresentation (against all defendants)

- Count X – Unjust enrichment (against all defendants)

- Count XI – Breach of written contract (against WITCC)

- Count XII – Tortious bad faith breach of contract or denial of contract (against WITCC)

- Count XIII – Tortious infliction of emotional distress (against all defendants)

Doc. 15.

3

### III. APPLICABLE STANDARDS

The Federal Rules of Civil Procedure authorize a pre-answer motion to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The Supreme Court has provided the following guidance in considering whether a pleading properly states a claim:

> Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." As the Court held in [*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007)], the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. *Id.*, at 555, 127 S. Ct. 1955 (citing *Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L.Ed.2d 209 (1986)). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." 550 U.S. at 555, 127 S. Ct. 1955. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.*, at 557, 127 S. Ct. 1955.
>
> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.*, at 570, 127 S. Ct. 1955. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*, at 556, 127 S. Ct. 1955. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* at 557, 127 S. Ct. 1955 (brackets omitted).

*Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009).

Courts assess "plausibility" by "'draw[ing] on [their own] judicial experience and common sense.'" *Whitney v. Guys, Inc.*, 700 F.3d 1118, 1128 (8th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 679). Also, courts "'review the plausibility of the plaintiff's claim as a whole, not the plausibility of each individual allegation.'" *Id.* (quoting *Zoltek Corp. v. Structural Polymer Grp.*, 592 F.3d 893, 896 n.4 (8th Cir. 2010)). While *factual*

4

"plausibility" is typically the focus of a Rule 12(b)(6) motion to dismiss, federal courts may dismiss a claim that lacks a cognizable *legal* theory. *See, e.g.*, *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013); *Ball v. Famiglio*, 726 F.3d 448, 469 (3d Cir. 2013); *Commonwealth Prop. Advocates, L.L.C. v. Mortg. Elec. Registration Sys., Inc.*, 680 F.3d 1194, 1202 (10th Cir. 2011); *accord Target Training Intern., Ltd. v. Lee*, 1 F. Supp. 3d 927 (N.D. Iowa 2014).

In considering a Rule 12(b)(6) motion to dismiss, ordinarily the court "cannot consider matters outside the pleadings without converting the motion into a motion for summary judgment." *McMahon v. Transamerica Life Ins.*, No. C17-149-LTS, 2018 WL 3381406, at *2 n.2 (N.D. Iowa July 11, 2018); *see* Fed. R. Civ. P. 12(b)(6). On the other hand, when a copy of a "written instrument" is attached to a pleading, it is considered "a part of the pleading for all purposes," pursuant to Federal Rule of Civil Procedure 10(c). Thus, when the pleadings necessarily embrace certain documents, I may consider those documents without turning a motion to dismiss into a motion for summary judgment. *Id.*

When a complaint does not state a claim for relief that is plausible on its face, the court must consider whether it is appropriate to grant the pleader an opportunity to replead. The rules of procedure permit a party to respond to a motion to dismiss by amending the challenged pleading "as a matter of course" within 21 days. *See* Fed. R. Civ. P. 15(a)(1)(B). Thus, when a motion to dismiss highlights deficiencies in a pleading that can be cured by amendment, the pleader has an automatic opportunity to do so. When the pleader fails to take advantage of this opportunity, the question of whether to permit an amendment depends on considerations that include:

> whether the pleader chose to stand on its original pleadings in the face of a motion to dismiss that identified the very deficiency upon which the court dismissed the complaint; reluctance to allow a pleader to change legal theories after a prior dismissal; whether the post-dismissal amendment

suffers from the same legal or other deficiencies as the dismissed pleading; and whether the post-dismissal amendment is otherwise futile.

*Meighan v. TransGuard Ins. Co. of Am.,* 978 F. Supp. 2d 974, 982 (N.D. Iowa 2013).

## IV.    ANALYSIS

Defendants' various motions make similar arguments as to why plaintiffs' claims should be dismissed.  As such, I will discuss arguments made by all defendants together and discuss, separately, any arguments unique to particular defendants within each section.

### A.    Count I – Violations of TVPRA

Defendants argue plaintiffs fail to state a claim because the allegations are not specific enough as to each defendant's alleged violative conduct.  They argue plaintiffs fail to allege what abuse or threatened abuse they were subjected to, or by whom, and which specific defendants required plaintiffs to work under the alleged conditions or threatened them with deportation.  They also argue Count I asserts multiple violations of the TVPRA that have unique elements and that plaintiffs fail to allege facts in support of each set of elements.

Plaintiffs have alleged three different claims within Count I:

- Forced labor under § 1589
- Trafficking under § 1590
- Peonage under § 1581

Section 1589 provides:

(a)    Whoever knowingly provides or obtains the labor services of a person by any one of, or by any combination of, the following means—

(1)    by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

6

(2)     by means of serious harm or threats of serious harm to that person or another person;

(3)     by means of the abuse or threatened abuse of law or legal process; or

(4)     by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint,

shall be punished as provided under subsection (d).

(b)     Whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means, shall be punished as provided in subsection (d).

18 U.S.C. § 1589. "Serious harm" is defined as "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2). "Abuse or threatened abuse of law or legal process" is defined as "the use or threatened use of a law or legal process . . . in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action." 18 U.S.C. § 1589(c)(1). The trafficking provision in § 1590 makes it a crime to "knowingly recruit[], harbor[], transport[], provide[], or obtain[] by any means," a person for forced labor. 18 U.S.C. § 1590(a).

The TVPRA provides a civil remedy under section 1595, stating:

An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. § 1595. Claims under section 1590 and 1595 require plaintiffs to sufficiently allege a predicate offense under section 1589. Section 1581 provides:

Whoever holds or returns any person to a condition of peonage, or arrests any person with the intent of placing him in or returning him to a condition of peonage, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1581.

Defendants challenge the forced labor claim based on (1) lack of specificity; (2) failure to allege force, threats, or abuse of process to cause plaintiffs to believe they would suffer serious harm and (3) lack of knowledge. Plaintiffs allege the following in Count I:

152. By recruiting Plaintiffs for WITCC's J-1 Visa Program, Defendants recruited, transported, provided or obtained Plaintiffs for labor or services.

153. Defendants knowingly benefited, either financially or by receiving things of value, specifically as follows:

a. Defendants Tur-Pak and Royal Canin were compensated with guaranteed workers who could not quit or even take a sick day without fear of retaliation.

b. The WITCC Defendants received a kickback for each hour of labor performed by Plaintiffs.

c. Defendant J&L Staffing benefited by obtaining employees who could not quit or even take a sick day for fear of legal repercussions (e.g., deportation) and serious physical harm (withholding food and housing).

8

154. Defendants told Plaintiffs the J-1 Visa Program was an educational cultural exchange program, and that they would study and work in an internship related to their field of study.

155. Defendants knowingly placed Plaintiffs in unskilled labor positions, which are not permitted under the J-1 Visa Program requirements, rather than placing them in internships related to their fields of study.

156. Defendants Royal Canin and Tur-Pak paid Defendants WITCC and J&L Staffing for the Plaintiffs' labor.

157. Defendants knowingly obtained the labor and services of Plaintiffs by means or the abuse or threatened abuse of the law or legal process.

158. Defendants expected Plaintiffs to work excruciating hours, to work while sick, and threatened Plaintiffs with deportation if Plaintiffs were unable to work.

Doc. 15 at 17-18.

With respect to individual plaintiffs, they allege:

96. After some time working at Tur-Pak, Plaintiff Melo was offered a position at Royal Canin because another J-1 Visa student had been fired for missing work due to illness.

143. Defendants threatened Plaintiff that if he did not work, he would be removed from the program. At one point, he broke a tooth while working but did not go to the dentist out of fear of missing work and being deported.

Plaintiffs seek damages for "mental and emotional harm and anguish." *Id.* ¶ 158(d).

Defendants argue that a threat of deportation cannot constitute serious harm or abuse of the legal process because plaintiffs were aware the J-1 visa program was temporary and they were expected to return to their home countries at the end of two years. They contend that returning home earlier than expected is not serious harm. They also note that plaintiffs have failed to identify who threatened them with deportation.

"The linchpin of the serious harm analysis under § 1589 is not just that serious harm was threatened but that the employer intended the victim to believe that such harm

9

would befall her." *United States v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011). Courts have recognized that the threat of deportation "can constitute serious harm to an immigrant within the meaning of the forced labor statute." *Elat v. Ngoubene*, 993 F. Supp. 2d 497, 523 (D. Md. Jan. 21, 2014) (quoting *United States v. Rivera*, No. 09-CR-619 (SJF), 2012 WL 2339318, at *5 (E.D.N.Y. June 19, 2012)). *See also United States v. Kozminski*, 487 U.S. 931, 948 (1988) ("threatening . . . an immigrant with deportation could constitute the threat of legal coercion that induces involuntary servitude."). *Ramo-Madrigal v. Mendiola Forestry Service, LLC*, 799 F. Supp. 2d 958, 960 (W.D. Ark. 2011) (when accepting plaintiffs' facts as true and viewing them in the light most favorable to plaintiffs, threatening H-2B workers with serious immigration consequences in order to prevent them from leaving employment constitutes "threatened abuse of the legal process" and states a valid claim under the TVPRA).

In the context of H-2B visas,[3] courts have determined that threats of deportation are sufficient to meet the "serious harm" element under either subsection 1589(a)(2) or (4) or "abuse of the legal process" element under subsection 1589(a)(3). *See Aida v. Grandeur Mgmt., Inc.*, 933 F.3d 89, 93-94 (2d Cir. 2019) (allegations that defendants threatened to cancel plaintiff's immigration sponsorship or terminate his employment if he complained about not receiving overtime pay constituted abuse of legal process for purposes of subsection 1589(a)(3) and scheme intended to cause plaintiff to believe he would face serious harm under subsection 1589(a)(4)); *United States v. Kalu*, 791 F.3d 1194, 1212 (10th Cir. 2015) (evidence that defendant repeatedly threatened foreign nationals with legal action, revocation of their visas, deportation and financial ruin were "precisely the types of threats that could 'compel a reasonable person of the same

---

[3] "The H-2B program allows U.S. employers or U.S. agents who meet specific regulatory requirements to bring foreign nationals to the United States to fill temporary nonagricultural jobs." *See* H-2b Temporary Non-Agricultural Workers, United States Citizenship and Immigration Services, https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-2b-temporary-non-agricultural-workers (last visited August 9, 2021). The maximum period of stay for an H-2B visa is three years.

background and in the same circumstances to perform or to continue performing labor or services to void incurring that harm.'") (quoting 18 U.S.C. § 1589(c)(2)); *Kiwanuka v. Bakilana*, 844 F. Supp. 2d 107,115 (D.D.C. 2012) (rejecting defendant's motion to dismiss forced labor claim under 18 U.S.C. § 1589 because plaintiff sufficiently alleged that defendants abused the legal process by threatening her with deportation should she fail to perform the work demanded of her); *Lesnik v. Eisenmann SE*, 374 F. Supp. 3d 923, 952 (N.D. Cal. 2019) (threats of deportation in addition to other threats were sufficient to state a claim under § 1589). *See also Aguirre v. Best Care Agency, Inc.*, 961 F. Supp. 2d 427, 444 (E.D.N.Y. Aug. 16, 2013) ("The threat of deportation alone may support a claim for forced labor.").

Taking plaintiffs' allegations as true, they have sufficiently alleged abuse or threatened abuse of legal process under subsection 1589(a)(3) or a scheme intended to cause plaintiffs to believe they would face serious harm under subsection 1589(a)(4) by alleging that defendants threatened them with deportation if they missed work.

With regard to the knowledge element, defendants argue plaintiffs fail to specify who made the alleged threats of deportation (or other threats constituting serious harm) and the extent to which other defendants had knowledge or recklessly disregarded the means by which plaintiffs' labor was obtained under section 1589(b). Section 1589(b) requires that defendants (1) "knowingly benefit[ed] financially or by receiving anything of value from" (2) participation in a venture they knew or should have known has engaged in providing or obtaining of labor or services by any means described in subsection (a). Therefore, there are two knowledge components – (1) knowledge of the benefit and (2) knowledge or reckless disregard of the means by which the venture[4] obtained the labor.

---

[4] While "venture" is not defined for purposes of § 1589, it is defined for purposes of § 1591(e)(6) as "any group of two or more individuals associated in fact, whether or not a legal entity." Some courts have applied that definition for purposes of § 1589. *See Bistline v. Parker*, 918 F.3d 849, 874-74 (10th Cir. 2019) (citing *Ricchio v. McLean*, 853 F.3d 553, 555 (1st Cir. 2017)).

11

As to the first knowledge component, plaintiffs have detailed the ways each of the defendants benefitted. *See* Doc. 15 at ¶ 153. They allege Tur-Pak and Royal Canin were compensated and guaranteed workers who could not quit or take a sick day, WITCC received a kickback for each hour of labor performed by plaintiffs and J&L obtained employees who could not quit or take a sick day. *Id.* These allegations are sufficient to meet the first knowledge element.

With regard to defendants' knowledge or reckless disregard of the means by which the venture engaged in forced labor, it is not clear from plaintiffs' FAC the extent to which Royal Canin and Tur-Pak knew or should have known that they were participating in a venture that engaged in acts in violation of chapter 77. Plaintiffs allege that Royal Canin and Tur-Pak paid WITCC and J&L for plaintiffs' labor, but it is unclear whether Royal Canin and Tur-Pak were engaged in threats of abuse of the legal process, or knew or recklessly disregarded that other defendants had engaged in such acts, or the extent of their knowing involvement in any "scheme" to make plaintiffs believe they would face serious harm if they stopped working. *See S.J. v. Choice Hotels Int'l, Inc.*, 473 F. Supp. 3d 147, 154 (E.D.N.Y. 2020) ("Because plaintiff has not alleged that the franchisor defendants had the requisite knowledge of a specific sex trafficking venture, they cannot be held directly liable under the TVPRA."); *Reyes-Trujillo v. Four Star Greenhouse, Inc.*, __ F. Supp. 3d __, 2021 WL 103636, at *20 (E.D. Mich. Jan. 12, 2021) ("Plaintiffs do not plead any facts that demonstrate how Defendants 'knew or should have known' that VCH had threatened the 2017 Plaintiffs with blacklisting from the H-2A program" and "the Complaint does not support an inference that Defendants were aware that VCH lied to the 2017 Plaintiffs about their immigration status, threatened to send them back to Mexico, or coordinated with immigration authorities to have them arrested and placed in removal proceedings.").

With regard to J&L and WITCC, plaintiffs have alleged that both WITCC and J&L were involved in recruiting students for the J-1 visa program and received payments from Royal Canin and Tur-Pak for plaintiffs' labor but, again, it is unclear whether

12

plaintiffs are alleging they engaged in the threats of deportation or had knowledge or reckless disregard of any such threats or scheme by others in the alleged venture. Doc. 15 at 17-20. Plaintiffs' FAC lacks specific factual allegations about each defendant's conduct, defendants' knowledge of each other's conduct or to establish a reckless disregard concerning the alleged violations. *See Reyes-Trujillo*, 2021 WL 103636, at *19, n.21 ("although conditions of a person's mind may be alleged generally, the plaintiff still must plead facts about the defendant's mental state, which, accepted as true, make the state-of-mind allegation plausible on its face." (quoting *Katoula v. Detroit Entertainment, LLC*, 557 F. App'x 496, 498 (6th Cir. 2014))).

These shortfalls in plaintiffs' FAC illustrate the problem with "shotgun style" pleading or "kitchen sink" pleading. *See Tatone v. SunTrust Mortgage, Inc.*, 857 F. Supp. 2d 821, 831 (D. Minn. 2012) ("A complaint which lumps all defendants together and does not sufficiently allege who did what to whom, fails to state a claim for relief because it does not provide fair notice of the grounds for the claims made against a particular defendant."). Without details as to who did what, I cannot determine whether the allegations are sufficient to state a TVPRA claim against each defendant.

With regard to the other claims within Count I, a claim of human trafficking under section 1590 requires a predicate offense under section 1589 and, therefore, fails to state a claim for the same reason as the section 1589 claim. Section 1581 prohibits holding or returning any person to a condition of peonage. 18 U.S.C. § 1581. Defendants argue plaintiffs have failed to state a claim under section 1581 because they do not allege that any debt was owed to defendants.

The Eighth Circuit has summarized the law concerning peonage as follows:

Peonage is 'compulsory service in payment of a debt.' *Bailey v. Alabama*, 219 U.S. 219, 242 (1911). '[C]ompulsory service' is the equivalent of 'involuntary servitude,' *id.* at 243, which the Supreme Court has defined as 'a condition of servitude in which the victim is forced to work for the defendant by the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process.' *United States v. Kozminski*, 487 U.S. 931, 952 (1988). Thus, in order to prove

13

peonage, the government must show that the defendant intentionally held a person against his or her will and coerced that person to work in order to satisfy a debt by (1) physical restraint or force, (2) legal coercion, or (3) threats of legal coercion or physical force. *See id.* at 952-53. In determining whether 'physical or legal coercion or threats thereof could plausibly have compelled the victim to serve,' the jury is entitled to consider 'evidence of other means of coercion, or of poor working conditions, or of the victim's special vulnerabilities.'

*United States v. Farrell*, 563 F.3d 364, 372 (8th Cir. 2009).

Plaintiffs allege defendants told them they would provide plaintiffs with food, housing, education and employment opportunities as part of the program and in exchange, plaintiffs were obligated to work at the job assigned to them as part of the J-1 visa program. While plaintiffs may have sufficiently alleged they were required to work to pay off a debt in the form of food, housing and education, it is unclear to which defendant(s) they owed such debt and which defendant intentionally held them against their will and coerced them into working.

For the reasons stated herein, Count I fails to state a claim of forced labor or trafficking under sections 1589 and 1590 or peonage under section 1581.

### B.    *Count II - FLSA Claims*

Plaintiffs' FLSA claims against Tur-Pak and Royal Canin are based on failure to pay overtime and withholding funds from their paychecks. Defendants argue that not all plaintiffs worked at each facility, that plaintiffs have failed to plead that Tur-Pak or Royal Canin were employers or joint employers and that, for those plaintiffs who worked at each facility, plaintiffs have not alleged facts supporting that they worked overtime and were not paid accordingly.

14

Tur-Pak notes that only three plaintiffs (De Souza Melo, Acevado and Silva Freire Soares) claim to have worked at Tur-Pak.[5] These three (or four) plaintiffs allege they worked only 40 hours per week at Tur-Pak. Eight plaintiffs allege they worked at Royal Canin. While some of these plaintiffs allege they may have worked more than 40 hours in a workweek, defendants argue they do not allege they were not paid overtime for the hours they worked over 40. Defendants argue plaintiffs' conclusory allegations are insufficient to state a claim.

Plaintiffs allege in Count II:

159. At all times relevant to this complaint, Plaintiffs were employed by Defendants Royal Canin and Tur-Pak.

160. At all times relevant to this complaint, Defendants Royal Canin and Tur-Pak were subject to the requirements of the [FLSA].

161. Defendants Royal Canin and Tur-Pak failed to pay Plaintiffs all wages due and failed to pay Plaintiffs time and a half for hours exceeding 40 per week.

Doc. 15 at 18. Plaintiffs claim additional discovery is necessary to determine the exact number of overtime hours each plaintiff worked and on what dates. They state their allegations that they were not paid all wages due is also based on the alleged unlawful and unauthorized withholding of funds from their paychecks as alleged in paragraphs 31, 65, 94, 109, 141, 150, 166, 171, 180(c), 216(b), 220-21, 228(c) and 229(b). The factual allegations for individual plaintiffs state as follows regarding the hours worked:

45. Plaintiff Bucco worked at Tur-Pak. She was paid $7.25 per hour and worked 40 hours per week.

49. Plaintiff Bucco changed her field of study to Robotics and Automation and then worked at Defendant Royal Canin.

_____

[5] Plaintiffs state that Jacqueline De Britto Bucco also worked at Tur-Pak. They concede that plaintiffs who never worked at Tur-Pak do not advance a cause of action under Count II against Tur-Pak. *See* Doc. 59 at 23-24.

15

50. Plaintiff Bucco's job was to package pet food. She was paid $7.25 per hour for her work at Royal Canin and worked between 32-50 hours per week.

64. Plaintiff Coutinho worked more than 36 hours a week [at Royal Canin], often working up to 52 hours per week.

79. There were weeks Plaintiff Magalhaes worked more than 54 hours per week [at Royal Canin] even though he understood the maximum hours worked was supposed to be 40 hours per week.

107. Plaintiff Pinto's work schedule [at Royal Canin] was unpredictable. He would work anywhere from 36-56 hours per week. He would often work 12 days in a row and would work double shifts on weekends.

116. Rather than the 30 hours per week, Plaintiff Reis was working 50-60 hours per week at Royal Canin.

129. Despite being told he would be working 32 hours per week, Plaintiff Rosa worked between 36-54 hours per week [at Royal Canin].

149. Plaintiff [Soares] worked approximately 40 hours per week [at Tur-Pak].

Doc. 15. All plaintiffs allege that Royal Canin and Tur-Pak paid $15 per hour for the labor plaintiffs provided, but that plaintiffs received only $7.25 per hour, with the rest of their earnings going to WITCC and J&L.

The FLSA provides:

[N]o employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1). Under the FLSA, employer "includes any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. §

16

203(d).  The Eighth Circuit Court of Appeals has recognized that the proper pleading standard for FLSA overtime claims has been subject to variable standards.  *Ash v. Anderson Merchandisers, LLC*, 799 F.3d 957, 962 (8th Cir. 2015).  For instance, the Second Circuit requires a plaintiff to allege 40 hours of work in a given workweek as well as some uncompensated time in excess of that 40 hours.  *Id.*  Other courts, such as the First Circuit require examples of unpaid time or a description of the nature of the work performed.  *Id.*  The Eighth Circuit did not resolve the issue in *Ash*, as it found that plaintiffs had failed to adequately allege that the defendant companies were their employers.  With respect to that issue, the court noted "the test of employment under the FLSA is one of 'economic reality.'"  *Ash*, 799 F.3d at 961.  It concluded plaintiffs did not "include any facts describing the 'economic reality' of their employment, such as their alleged employers' right to control the nature and quality of their work, the employers' right to hire or fire, or the source of compensation for their work."  *Id.*  The court found plaintiffs' allegations that the defendants were "part of an integrated enterprise" were conclusory and plaintiffs had failed to allege any facts that would allow an inference that defendants were their employer.  *Id.* at 961.

Here, plaintiffs have alleged sufficient facts in support of their claims regarding lack of overtime payments.  While their allegations do not contain details as to which weeks they worked over 40 hours and how much they were paid for those weeks, they have identified plaintiffs who would often work over 40 hours and alleged that defendants failed to pay time-and-a-half for those hours.  This is sufficient at the pleading stage.  Plaintiffs have also alleged sufficient facts in support of their claims that funds were unlawfully or unwilfully withheld.  They identify the amount withheld and to whom the withheld funds were paid.

With regard to identifying their employer, plaintiffs' FAC is ambiguous.  They allege in other sections of the complaint that Royal Canin and Tur-Pak paid WITCC and J&L for plaintiffs' labor and state that J&L benefited by obtaining "employees."  *See* Doc. 15 at ¶¶ 153(c), 156.  While this could mean J&L obtained employees for Tur-Pak

17

and Royal Canin, it could also mean plaintiffs are claiming they were employees of J&L, or both J&L and either Royal Canin or Tur-Pak, which is sometimes the case when a company uses a staffing agency. *See Butler v. Drive Auto. Indus. of Am., Inc.*, 793 F.3d 404, 415 (4th Cir. 2015) (temporary staffing agency and manufacturer where plaintiff was placed were joint employers). There are no facts to resolve this ambiguity, such as facts describing the "economic reality" of plaintiffs' employment – i.e., who they reported to, who had the right to hire or fire, the source of their work schedules and the information they were given at the start of their employment. *See Ash*, 799 F.3d at 961. Because plaintiffs have not adequately alleged which defendants were their employers, Count II fails to state a claim under the FLSA.

### C.     *Count III – IWPCL*

Count III is alleged against Royal Canin and Tur-Pak. Plaintiffs do not resist dismissal of Count III against Royal Canin, as it is not located in Iowa. Tur-Pak argues that only three plaintiffs claim to have worked at Tur-Pak and seek dismissal because plaintiffs fail to properly allege who acted as each plaintiff's employer. Iowa Code § 91A.5 provides: "an employer shall not withhold or divert any portion of an employee's wages" unless certain exceptions apply. The IWPCL provides that employer means "a person, as defined in chapter 4, who in this state employs for wages a natural person." Iowa Code § 91A.2. Similar to Count II, plaintiffs have not sufficiently alleged that Tur-Pak was their employer. As such, Count III fails to state a claim under the IWPCL.

### D.     *Counts IV and V – RICO Claims*

Defendants argue plaintiffs' FAC fails to meet the heightened pleading standard applicable to RICO claims. They also argue plaintiffs' allegations are insufficient to establish two necessary elements of any RICO claim: (1) an "enterprise" among defendants and (2) open- or closed-ended continuity, which is necessary to show a pattern of racketeering or criminal activity. They note that fraudulent misrepresentation, as

18

alleged by plaintiff, is not a recognized type of fraud that constitutes racketeering activity under 18 U.S.C. § 1961(1). WITCC argues that, as a public community college, it cannot be liable for a RICO violation and that plaintiffs lack standing to pursue a RICO claim.[6]

RICO prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). A civil claim under RICO requires plaintiffs to show that defendants engaged in "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *H & Q Props. v. Doll*, 793 F.3d 852, 856 (8th Cir. 2015) (citations omitted). To establish a RICO conspiracy, plaintiffs must additionally prove that a defendant "objectively manifested an agreement to participate . . . in the affairs of [the] enterprise." *United States v. Darden*, 70 F.3d 1507, 1518 (8th Cir. 1995). The elements must be pleaded with respect to each defendant. *Craig Outdoor Advert., Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1027 (8th Cir. 2008). Plaintiffs acknowledge that their RICO claims are subject to the heightened pleading requirements under Rule 9(b).

### 1.    *Count IV – Violation of RICO*
#### a.    *Involvement in a RICO Enterprise*

Under RICO, an "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact requires: "(1) a common purpose that animates the individuals associated with it; (2) an ongoing

---

[6] Neither the Eighth Circuit nor the Supreme Court have addressed the issue of whether a government entity is incapable of forming the requisite mens rea to violate RICO as alleged by WITCC. I need not resolve this issue or WITCC's standing argument as I find plaintiffs have failed to state their RICO claims on other grounds.

19

organization with members who function as a continuing unit and (3) an ascertainable structure distinct from the conduct of a pattern of racketeering." *Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 354 (8th Cir. 2011) (internal citation and quotations omitted). "In deciding whether an alleged RICO enterprise has an ascertainable structure distinct from the pattern of racketeering, we must determine if the enterprise would still exist were the predicate act removed from the equation." *Id.* at 354-55.

Plaintiffs argue the FAC alleges an ascertainable structure distinct from the pattern of racketeering in that defendants worked together to implement the J-1 visa program. They contend the enterprise would have been able to exist without the predicate acts because plaintiffs could have been assigned positions or job duties that aligned with their field of study, been paid a fair wage without secret deductions and been provided with the educational opportunity, food, meals and basic living essentials they were promised.

I disagree. The FAC contains no facts to establish that the defendants had an "ascertainable" structure that existed outside the alleged pattern of racketeering activity. Plaintiffs claim only that "[a]t all times material to this complaint, Defendants WITCC, Royal Canin, Tur-Pak and J&L Staffing were engaged in an ongoing business relationship." Doc. 15 at ¶ 167. Plaintiffs do not allege any further facts regarding the nature of this business relationship outside of the facts pertaining to the alleged unlawful conduct related to the J-1 visa program. They do not allege, for example, that defendants had previously worked together to set up students with jobs or internships. They rely solely on a hypothetical that defendants *could* have done so. As such, there are no factual allegations to suggest the enterprise "would still exist were the predicate acts removed from the equation." *See Crest II*, 660 F.3d at 354-55 ("[W]hile 'each member of th[e] group carried on other legitimate activities, these activities were not in furtherance of the common or shared purpose of the enterprise and, thus, were not acts of the enterprise.'"). *See also Diamonds Plus, Inc. v. Kolber*, 960 F.2d 765, 770 (8th Cir. 1992) ("The focus of the inquiry is whether the enterprise encompasses more than what is necessary to commit the predicate RICO offense."). The Eighth Circuit has declined to find a RICO

20

enterprise when "[t]he only common factor that linked . . . the parties together and defined them as a distinct group was their direct or indirect participation in [the] scheme to defraud [the plaintiff]." *Stephens, Inc. v. Geldermann, Inc.*, 962 F.2d 808, 815-16 (8th Cir. 1992). Without the alleged predicate acts, the association-in-fact enterprise "had no form or structure." *Id. See also Schuster v. Anderson*, 378 F. Supp. 2d 1070, 1096-97 (N.D. Iowa 2005) ("As a matter of law, it is not sufficient that several organized, ongoing groups come together for one concerted action, unless those groups can also be shown to constitute a larger unit, over and above their separate structures and operations, and that this unit meets the [] criteria for an association-in-fact.").

Plaintiffs do not allege facts of a form or structure that existed outside the predicate acts. There are no allegations that defendants had any relationship outside the alleged predicate acts. Thus, plaintiffs have failed to allege sufficient facts to establish the existence of a RICO enterprise.

### b. *Pattern of Racketeering Activity*

Defendants argue that plaintiffs also fail to allege a pattern of racketeering that lasted more than one year. "Racketeering activity" includes acts that are indictable under 18 U.S.C. §§ 1581-92 (relating to peonage, slavery and trafficking in persons). *See* 18 U.S.C. § 1961. A pattern of racketeering activity requires at least "two acts of racketeering activity" that amount to or pose a threat of continued criminal activity. *Craig Outdoor Advert., Inc.*, 528 F.3d at 1028. Such a pattern requires either "multiple predicate acts occurring over a substantial period of time (closed-ended continuity)" or "predicate acts [that] threaten to extend into the future (open-ended continuity)." *Crest II*, 660 F.3d at 356 (internal citation and quotations omitted. A "substantial period of time" for closed-ended continuity is defined as "a period of time lasting at least one year." *United States v. Hively*, 437 F.3d 752, 761 (8th Cir. 2006).

I agree that plaintiffs have failed to state a RICO claim on this basis as well. With respect to closed-ended continuity, plaintiffs do not allege when the alleged predicate acts

21

began, but the acceptance letters attached to the FAC are dated June 3, 2019. Plaintiffs allege they stopped working at Tur-Pak and Royal Canin in late 2019 and that the J-1 visa program ended in January 2020, with students being told to vacate student housing in February and March 2020. *See* Doc. 15 at ¶¶ 33-37. Accepting plaintiffs' allegations as true, the alleged predicate acts did not last at least one year and therefore did not occur "over a substantial period of time" to constitute closed-ended continuity. *See Hively*, 437 F.3d at 761.

Plaintiffs also fail to allege that the alleged predicate acts were the "regular way of conducting an ongoing legitimate business or RICO enterprise" that could constitute open-ended continuity. *See Crest II*, 660 F.3d at 358. Plaintiffs allege only the one-time participation in the J-1 visa program that ended, at the latest, in March 2020. Plaintiffs rely on *Hively* to argue there was a sufficient threat of repetition to show open-ended continuity. *Hively* involved a mail fraud scheme in which defendant, through his law partner, obtained federal and state grant money to which he was not entitled. *Hively*, 437 F.3d at 757. The court reasoned that at the time the search warrant was executed on defendant's firm, he was still in the office and receiving grant money on a monthly basis such that a reasonable jury could have found a "distinct threat of long-term racketeering activity." *Id.* at 762. Plaintiffs allege that a similar threat was present here because the unlawful activity would have continued but for the investigation by the Department of State in November 2019. This is incorrect, as the J-1 visa program had an established end-point even without the State Department's intervention. There are no allegations of a larger or ongoing scheme to continuously recruit J-1 visa holders and place them at Royal Canin or Tur-Pak. Plaintiffs' allegations, which related to a single, two-year program, fail to establish closed-ended or open-ended continuity or any pattern of racketeering activity. For this additional reason, Count IV fails to state a claim under RICO.

## 2. *Count V – RICO Conspiracy*

Plaintiffs have also failed to state a claim of RICO conspiracy. To state a claim of RICO conspiracy, plaintiffs must allege facts to establish that: (1) "an enterprise existed," (2) "the enterprise affected interstate or foreign commerce," (3) "the defendant associated with the enterprise" and (4) the defendant "objectively manifested an agreement to participate . . . in the affairs of [the] enterprise." *Aguilar v. PNC Bank, N.A.*, 853 F.3d 390, 402 (8th Cir. 2017) (quoting *Darden,* 70 F.3d at 1518*)*. A RICO conspirator must "intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." *Salinas v. United States*, 522 U.S. 52, 65 (1997). Plaintiffs must demonstrate that the defendants were "aware of the scope of the enterprise and intended to participate in it." *Aguilar*, 853 F.3d at 402 (citation omitted). Because I have determined that plaintiffs have not sufficiently alleged that an enterprise existed, Count V fails to state a claim of RICO conspiracy.

## E. *Count VI – Violation of the 13th Amendment*

Defendants argue Count VI fails because there is no private right of action under the Thirteenth Amendment to the United States Constitution and there cannot be slavery or indentured servitude "when the employee has a choice, even if it is a painful or undesirable one." *See United States v. Shackney*, 333 F.2d 475, 486 (2d Cir. 1964). J&L argues that plaintiffs were not subject to involuntary servitude because they have admitted they had the option of working with WITCC to find other jobs and that many plaintiffs did work other jobs. WITCC argues that it was required to provide "continuous on-site supervision and mentoring of trainees and interns" under 22 C.F.R. § 62.22(f)(2)(ii) as part of the J-1 visa program.

The Thirteenth Amendment to the United States Constitution states:

> Section 1. Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.
>
> Section 2. Congress shall have the power to enforce this article by appropriate legislation.

U.S. Const. amend. XIII. The Supreme Court has held the Amendment "is not a mere prohibition of State laws establishing or upholding slavery, but an absolute declaration that slavery or involuntary servitude shall not exist in any part of the United States." *Civil Rights Cases*, 109 U.S. 3, 20 (1883). The Eighth Circuit has recognized that 42 U.S.C. § 1983 "reflect[s] congressional resolve to enforce the rights granted in the Thirteenth . . . Amendment[] to the United States Constitution." *Ellis v. Houston*, 742 F.3d 307, 318 (8th Cir. 2014).

Section 1983 is limited to actions taken "under color of" state law. *See Campbell*, 986 F.3d 822, (8th Cir. 2021) ("§ 1983 excludes from its reach merely private conduct, in that, for a § 1983 claim to succeed, a defendant must have acted under color of state law.") (internal quotations omitted). *See also Youngblood v. Hy-Vee Food Stores, Inc.*, 266 F.3d 851, 855 (8th Cir. 2001) ("Only state actors can be held liable under Section 1983."). Plaintiffs argue that WITCC is alleged to be a public community college and therefore, is a state actor that may be held liable for constitutional infringements pursuant to 42 U.S.C. § 1983. Plaintiffs also allege that because the other defendants' conduct is intertwined with the state actor, they too may be held liable for the alleged constitutional violation. "A private party who willfully participates in joint activity with the State or its agents is considered a state actor." *Youngblood*, 266 F.3d at 855 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970)). "In construing that test in terms of the allegations necessary to survive a motion to dismiss, [the Eighth Circuit has] held that a plaintiff seeking to hold a private party liable under § 1983 must allege, at the very least, that there was a mutual understanding, or a meeting of the minds, between the private party and the state actor." *Mershon v. Beasley*, 994 F.2d 449, 451 (8th Cir. 1993).

Plaintiffs must allege facts that "the defendants had directed themselves toward an unconstitutional action by virtue of a mutual understanding." *Smith v. Bacon*, 699 F.2d 434, 436 (8th Cir. 1983) (quoting *White v. Walsh*, 649 F.2d 560, 561 (8th Cir. 1981)).

Count VI of the FAC alleges that defendants "deprived Plaintiffs of the rights guaranteed to them under the Thirteenth Amendment to the United States Constitution, in violation of 42 U.S.C. § 1983." Doc. 15 at ¶ 191. Plaintiffs allege defendants collectively required plaintiffs to work under conditions that constituted involuntary servitude and state that defendants exerted "extreme psychological pressure" on plaintiffs to coerce them to work including: threats to revoke their visas and deport them if they missed work, threatening them with large amounts of debt if they missed work, threatening to withhold food or housing if they failed to work, charging at least $250 per week if they were not working at jobs where defendants were getting financial benefits from plaintiffs' work and dictating when and where plaintiffs could work and under what conditions in their free time. Doc. 15 at ¶¶ 183-84. Plaintiffs further allege that defendants isolated them and controlled their movements, including requiring plaintiffs to live in WITCC housing, restricting their access to vehicles or their ability to obtain finances to purchase plane tickets to return home, contractually obligating plaintiffs to keep WITCC aware of their location at all times and generally taking advantage of plaintiffs' natural isolation that occurred due to their status as immigrants with limited English-speaking abilities. Doc. 15 at ¶¶ 185-86. Plaintiffs allege that as a result of these conditions and their indebtedness to defendants after they were brought to the United States, plaintiffs had no real choice but to work for defendants until the program was shut down. *Id.* ¶¶ 187-88. They allege that defendants established, maintained and enforced policies, regulations, official decisions, customs or usage that were recklessly or deliberately indifferent to plaintiffs' rights. *Id.* at ¶¶ 189-90.[7]

---

[7] Plaintiffs do not identify the substance of these alleged regulations, official decisions, customs or usage.

The closest plaintiffs come to alleging a meeting of the minds (at least in Count VI) is that defendants acted "collectively." Doc. 15 at ¶ 183. Other parts of the FAC, such as Count V – Conspiracy to Commit RICO Violations –allege that defendants agreed to accomplish an unlawful plan to engage in a pattern of racketeering activity and agreed to the overall objective of recruiting plaintiffs for unskilled labor positions under the guise of having the plaintiffs participate in WITCC's J-1 visa program. *Id.* at ¶¶ 177-80. Plaintiffs do not incorporate these allegations or any previous allegations into Count VI. Plaintiffs do not allege any facts to indicate that WITCC or any of the private-entity defendants came to a mutual understanding or meeting of the minds such that the private entity defendants' actions could be considered "under color of" state law. Because plaintiffs have failed to allege the minimum requirement of a meeting of the minds between the private entity defendants and state actor, they have failed to state a claim as to J&L, Royal Canin and Tur-Pak. Thus, I will consider Count VI as to only the WITCC defendants.

The Supreme Court has held that involuntary servitude requires physical or legal coercion and that psychological coercion is insufficient. *See Kozminski*, 487 U.S. at 944-45 ("our precedents clearly define a Thirteenth Amendment prohibition of involuntary servitude enforced by the use or threatened use of physical or legal coercion. The guarantee of freedom from involuntary servitude has never been interpreted specifically to prohibit compulsion of labor by other means, such as psychological coercion."). *Kozminski* dealt with criminal prosecutions under 18 U.S.C. §§ 241 and 1584, which the Court characterized as criminal statutes enacted by Congress to enforce the Thirteenth Amendment.[8] While it did not address a Thirteenth Amendment claim per se, it defined "involuntary servitude" for purposes of sections 241 and 1584. *Kozminski* established

---

[8] 18 U.S.C. § 241 prohibits conspiracy to interfere with an individual's Thirteenth Amendment right to be free from "involuntary servitude" and 18 U.S.C. § 184 makes it a crime to knowingly and willfully hold another person "to involuntary servitude." *Kozminski*, 487 U.S. at 934.

that the term "involuntary servitude" means "a condition of servitude in which the victim is forced to work for the defendant by the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process." *Id.* at 952. "Congress created 18 U.S.C. § 1589 specifically to broaden victims' protection beyond the slavery-like conditions prohibited by Section [1584] as interpreted by the *Kozminski* Court." *Walia v. Veritas Healthcare Solutions, L.L.C.*, No. 13 Civ. 6935(KPF), 2015 WL 4743542, at *4 (S.D.N.Y. Aug. 11, 2015) (citing *Javier v. Beck*, No. 13 Civ. 2926(WHP), 2014 WL 3058456, at *6 (S.D.N.Y. July 3, 2014)). *See* Victims of Trafficking and Violence Protection Act of 2000 (TVPA), 22 U.S.C. § 7101 ("Involuntary servitude statutes are intended to reach cases in which persons are held in a condition of servitude through nonviolent coercion. In [*Kozminski*], the Supreme Court found that section 1584 of title 18, United States Code, should be narrowly interpreted, absent a definition of involuntary servitude by Congress. As a result, that section was interpreted to criminalize only servitude that is brought about through use or threatened use of physical or legal coercion, and to exclude other conduct that can have the same purpose and effect."). This leaves open the question of how "involuntary servitude" is defined under the Thirteenth Amendment when an individual seeks to enforce it pursuant to § 1983. While the *Kozminski* Court stated it drew no conclusions from its historical survey about the "potential scope of the Thirteenth Amendment," in the absence of a congressional definition *Kozminski* provides the best authority for interpretation of "involuntary servitude" as used in the Thirteenth Amendment.

Paragraph 184 of Count VI alleges instances of "extreme psychological pressure." Doc. 15 at ¶ 84. As recognized in *Kozminski*, psychological coercion is insufficient. *Kozminski*, 487 U.S. at 944 ("The guarantee of freedom from involuntary servitude has never been interpreted specifically to prohibit compulsion of labor by other means, such as psychological coercion."). However, plaintiffs also allege that defendants required plaintiffs to live in WITCC housing, restricted plaintiffs' access to vehicles to leave or their ability to purchase plane tickets to return home and contractually obligated plaintiffs

27

to keep WITCC aware of their location at all times.  *Id.* at ¶ 185.  Additionally, plaintiffs allege they faced threats of deportation if they stopped working as part of the program. If true, these actions could constitute physical or legal coercion.  While defendants argue that plaintiffs had a choice to return home or work other jobs or that WITCC was required to provide continuous on-site supervision of plaintiffs by regulation, these arguments are better suited for a motion for summary judgment.  For purposes of a motion to dismiss, I must accept plaintiffs' allegations as true.  Those allegations state that defendants restricted their ability to return home and threatened plaintiffs with debt, deportation and withholding food and housing if they refused to work at the assigned jobs.  These alleged actions fall within the use or threat of physical or legal coercion that could constitute involuntary servitude under *Kozminski*.  As such, Count VI alleges a plausible claim of a Thirteenth Amendment violation under 42 U.S.C. § 1983 as to the WITCC defendants.

## F.     Count VII – Due Process Claims

J&L, Royal Canin and Tur-Pak argue that Count VII fails against them because they are not state actors.  Plaintiffs argue that because WITCC is a public community college and the allegations involve a fraudulent scheme amongst the defendants, the private entity defendants may be liable under the "joint action test."  WITCC argues plaintiffs fail to state due process claims against it because plaintiffs do not identify it as a state actor and, under *Godfrey v. State*, 898 N.W.2d 844, 850 (Iowa 2017), there are other adequate remedies provided by law.  Further, it asserts that plaintiffs must bring their tort claims pursuant to chapter 669 and that the State's waiver of sovereign immunity does not apply to most of plaintiffs' claims.[9]

---

[9] These arguments are confusing.  WITCC seems to be arguing that sovereign immunity bars plaintiffs' claims, but also acknowledges that Iowa community colleges are not subject to sovereign immunity.  *See* Doc. 39-1 at 24 ("It should further be noted that an Iowa community college has not been recognized as eligible for claiming sovereign immunity.").  While it does not cite a case, *Iowa Valley Community College Dist. v. Plastech Exterior Systems, Inc.*, 256 F.

Plaintiffs bring their due process claims under Article I, section 9 of the Iowa Constitution.[10]  To state a claim of procedural due process, plaintiffs must show an impairment of an interest in life, liberty or property by government action.  *Behm v. City of Cedar Rapids*, 922 N.W.2d 524, 566 (Iowa 2019).  "Once a protected interest has been established, the next question is what procedural minima must be provided before the government may deprive the complaining party of the protected interest."  *Id.* (citing *In re C.M.*, 652 N.W.2d 204, 212 (Iowa 2002)).  "[A] violation of substantive due process may arise from government action that 'shocks the conscience.'"  *Id.* at 550 (quoting *Zaber v. City of Dubuque*, 789 N.W.2d 634, 640 (Iowa 2010)).

Plaintiffs note they have alleged that WITCC is a public community college organized and existing under the laws of the State of Iowa.  *See* Doc. 15 at ¶ 14.  With regard to the other defendants, plaintiffs argue they have pleaded that the defendants participated in a joint activity that deprived plaintiffs of their procedural and substantive due process rights under the Iowa Constitution and that defendants worked together in a scheme that resulted in the deprivation of plaintiffs' constitutional rights.  Plaintiffs cite the "joint action test," the "symbiotic relationship test," and the "nexus" test to argue that Royal Canin, Tur-Pak and J&L may be considered "state actors."

The Eighth Circuit has stated:

> To ascertain whether there is state action in a case, we examine the record to determine "whether the conduct at issue is 'fairly attributable' to the state." *Montano v. Hedgepeth,* 120 F.3d 844, 848–849 (8th Cir.1997) (quoting *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937 (1982)). We are guided in this inquiry by two additional queries: whether the claimed

---

Supp. 2d 959, 964-66 (S.D. Iowa 2003) supports that proposition.  To the extent WITCC is arguing that plaintiffs must bring their claims pursuant to chapter 669, the Iowa Supreme Court has determined that community colleges do not qualify as "state agencies" for purposes of chapter 669.  *See Graves v. Iowa Lakes Community College*, 639 N.W.2d 22, 26-27 (Iowa 2002), *overruled on other grounds by Kiesau v. Bantz*, 686 N.W.2d 164 (Iowa 2004)).  I will not dismiss Count VII on these bases.

[10] Plaintiffs state in their resistances they are not pursuing federal constitutional claims under 42 U.S.C. § 1983.

deprivation "resulted from the exercise of a right or privilege having its source in state authority" and whether the party engaging in the deprivation "may be appropriately characterized as [a] state actor[ ]." *See Lugar,* 457 U.S. at 939 (internal quotations omitted).

. . . .

The Supreme Court has recognized a number of circumstances in which a private party may be characterized as a state actor, such as where the state has delegated to a private party a power "traditionally exclusively reserved to the State," *see Jackson v. Metro. Edison Co.,* 419 U.S. 345, 352 (1974), where a private actor is a "willful participant in joint activity with the State or its agents," *see Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 151 (1970), and where there is "pervasive entwinement" between the private entity and the state, *see Brentwood,* 531 U.S. at 291. These particular circumstances are merely examples and not intended to be exclusive. *See id.* at 295.

Our ultimate conclusion must turn on the particular facts of the case, since "[o]nly by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 722 (1961). The one unyielding requirement is that there be a "close nexus" not merely between the state and the private party, but between the state and the alleged deprivation itself. *See Brentwood,* 531 U.S. at 295. No such nexus exists where a private party acts with the mere approval or acquiescence of the state, *see Blum v. Yaretsky,* 457 U.S. 991, 1004–05 (1982), but a private entity may be considered a state actor if it "has acted together with or has obtained significant aid from state officials" in furtherance of the challenged action. *Lugar,* 457 U.S. at 937.

*Wickersham v. City of Columbia*, 481 F.3d 591, 597 (8th Cir. 2007).

Viewed through this framework, plaintiffs' allegations are insufficient to state due process claims against the private entity defendants. Plaintiffs fail to allege facts to support that actions by Tur-Pak, Royal Canin or J&L were so entwined with State action that they may be fairly treated as actions by the State itself. As noted above, there are no allegations to support a mutual understanding or meeting of the minds between the private entity defendants and the WITCC defendants. While plaintiffs argue they have alleged that defendants worked together in a "scheme" that resulted in the deprivation of plaintiffs' constitutional rights, the allegations in the Factual Background of the FAC or

Count VII fail to describe such a scheme or any facts necessary to satisfy the "joint action test," the "symbiotic relationship test," or the "nexus" test. Plaintiffs merely use the collective term "defendants" throughout the FAC. Plaintiffs rely on conclusions and labels, not factual allegations, to support the application of any test that would subject the private entity defendants to liability for a due process violation. *See Ciambriello v. County of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002) ("A merely conclusory allegation that a private entity acted in concert with a state actor does not suffice to state a § 1983 claim against the private entity.").

With regard to the WITCC defendants, the Iowa Supreme Court has held that the State of Iowa and state officials acting in their official capacities may be sued directly for a violation of article I, section 9 of the Iowa Constitution if state law does not provide an adequate remedy. *Godfrey v. State of Iowa*, 898 N.W.2d 844, 846-47 (Iowa 2017) (majority opinion); *id*. at 880-81 (Cady, C.J., concurring in part and dissenting in part). The parties dispute whether there is an adequate remedy such that plaintiffs may pursue a direct constitutional claim. The WITCC defendants argue that plaintiffs have other legal avenues for redress as evidenced by the numerous causes of action alleged in the FAC. Plaintiffs argue that, unlike the situation in *Godfrey*, their damages do not arise out of a simple employer/employee relationship, but instead are based on WITCC's "role as a state-sponsored educational institution that made fraudulent representations to Plaintiffs in order to lure them into involuntary servitude." Doc. 61 at 40. In other words, they contend this case involves harms such that "a remedy of punitive damages may be necessary to vindicate a plaintiff's constitutional rights," distinguishing it from *Godfrey*, in which the Court found that plaintiff's injury was largely monetary in nature and that the absence of punitive damages under the Iowa Civil Rights Act did not render it an inadequate remedy for sexual-orientation discrimination damages. *Id*. at 881.

Notably missing from the WITCC defendants' argument is an adequate remedy provided by the Iowa legislature. *Id*. at 880 (Cady, C.J., concurring in part) ("I concur in the opinion of the court to the extent it would recognize a tort claim under the Iowa

31

Constitution when the *legislature* has not provided an adequate remedy.") (emphasis added). Defendants point only to plaintiffs' federal claims under the TVPRA, their Iowa common law claims and claims they argue plaintiffs could have pursued (but did not) under the Iowa Civil Rights Act. For this reason, I decline to dismiss Count VII based on an "adequate remedy" argument.

However, I agree with WITCC that plaintiffs' allegations as to Count VII are vague and conclusory and fall far short of stating a plausible claim. "[T]he first inquiry in a procedural due process analysis is whether a protected liberty or property interest is involved." *Bowers v. Polk Cnty. Bd. of Supervisors*, 638 N.W.2d 682, 691 (Iowa 2002) (citing *Callender v. Skiles*, 591 N.W.2d 182, 189 (Iowa 1999)). The first inquiry for a substantive due process claim is also determining "the nature of the individual right involved." *Hensler*, 790 N.W.2d 569, 580 (Iowa 2010). Plaintiffs have not sufficiently identified the protected liberty or property interest at stake for purposes of either a procedural or substantive due process claim. The only hint of a claimed interest is in their statement that punitive damages are necessary to vindicate their "infringed rights of privacy and/or dignity." *Id.* at ¶ 199. Plaintiffs offer no further explanation in the FAC or their resistances of the nature of the claimed privacy and/or dignity interest or how such an interest was infringed through defendants' alleged actions. Plaintiffs have not alleged that a protected liberty or property interest was involved.

The most substantive allegation in Count VII is that defendants "deprived Plaintiffs of procedural and substantive due process, through policy, practice and/or custom, when recklessly and/or intentionally subjecting them to human and labor trafficking, coercing them to work for Defendants' benefit, isolating and controlling their movements and sources of financial independence, and threatening them with deportation or other punishment as fully detailed above." Doc. 15 at ¶ 194. Plaintiffs do not describe the policy, practice and/or custom in any further detail. Their resistances provide no authority that such actions, if true, could constitute a substantive or procedural due process violation. Thus, with regard to Count VII, plaintiffs' allegations fail to state a

32

plausible claim of a substantive or procedural due process violation against the WITCC defendants.

## G.      Count VIII – Fraudulent Misrepresentation

Defendants argue plaintiffs have not pled this claim with sufficient particularity as required under Fed. R. Civ. P. 9(b). They state plaintiffs lump all defendants together and fail to identify specific fraudulent statements, who made them, when and where they were made and how they were conveyed.

Fraudulent misrepresentation requires proof of: (1) a representation; (2) falsity; (3) materiality; (4) scienter; (5) intent; (6) justifiable reliance; and (7) resulting injury. *See Smidt v. Porter*, 695 N.W.2d 9, 22 (Iowa 2005). Federal Rule of Civil Procedure 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." This means a plaintiff must identify the "who, what, when, where, and how: the first paragraph of any newspaper story." *See Great Plains Trust Co. v. Union Pac. R. Co.*, 492 F.3d 986, 995 (8th Cir. 2007) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.), *cert. denied*, 498 U.S. 941 (1990)). "Conclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule." *BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 917 (8th Cir. 2007) (quoting *Commercial Property Invs. Inc. v. Quality Inns Int'l Inc.*, 61 F.3d 639, 644 (8th Cir. 1995)).

Plaintiffs argue they are permitted to collectively refer to defendants because they allege defendants worked together to perpetuate a fraudulent scheme. They cite paragraphs 200 through 208 of the FAC in support and argue that other allegations in the FAC explain in detail each defendant's conduct that expose it to liability. Paragraphs 200 through 208 essentially allege that defendants' misrepresented WITCC's federal J-1 visa program because the plaintiffs' jobs held no educational value and were unrelated to their field of study.

33

I agree with defendants that plaintiffs' allegations fall short of stating a claim of fraudulent misrepresentation under the requirements of Rule 9(b). Count VIII in plaintiffs' FAC refers generally to "defendants' representations" multiple times. They do not identify which representations they are alleging were fraudulent, who made the representations or when and where they were made. While plaintiffs identify some more specific representations[11] made to individual plaintiffs, it is not clear from the FAC whether these are the fraudulent misrepresentations alleged in Count VIII, when and where these statements were made and, in some instances, who made the statements. Plaintiffs generally allege the jobs in which they were placed held no educational value and were unrelated to their field of study.

The main problem with plaintiffs' allegations of fraudulent misrepresentation is that they do not provide defendants sufficient notice of the claims against them, as plaintiffs lump all defendants together in making their allegations. While plaintiffs allege

---

[11] *See* Doc. 15 at ¶ 40 ("Defendant Burright told Plaintiff Bucco that she would receive free housing and food as well as scholarships to cover her tuition."); *Id.* at ¶ 44 ("Plaintiff was told by Defendant Burright she would be studying at WITCC and working 32 hours per week at Defendant Tur-Pak."); *Id.* at ¶ 61 ("Plaintiff Coutinho was told he would be studying at WITCC and working 36 hours per week at Defendant Royal Canin as a robotics and automation technician. He was also told he would not pay any fees to WITCC and his housing and food would be provided."); *Id.* at ¶ 70 ("Plaintiff Costa was told that the job she would be placed in could be [sic] a factory, but it would be related to her field of study and would give her valuable professional experience"); *Id.* at ¶ 77 ("Plaintiff Magalhaes was told he would more than likely be working at Royal Canin, and his job would be related to robotics or machine maintenance."); *Id.* at ¶ 90 ("Defendant Burright's Facebook post represented the J-1 Visa Program as a 2-year program in which students could study and work in an internship related to their field of study."); *Id.* at ¶ 113 ("When Plaintiff Reis inquired about the program, Defendant Burright told him it was a two-year program which would allow Plaintiff Reis to study Robotics and Automation and work in the field of robotics."); *Id.* at ¶ ("The Facebook post [from Burright] described the program as a 2-year program in which students could study and work in a field related to their studies. The post said fees and housing would be paid for."); *Id.* at ¶ 129 ("Despite being told he would be working 32 hours per week, Plaintiff Rose worked between 36-54 hours per week."); *Id.* at ¶ 138 ("Plaintiff Acevedo was told by Defendants that he would receive free housing and food."); *Id.* at ¶ 141 ("Plaintiff Acevedo asked [why] Defendants took money he earned from his paychecks. They told him it was because he had to reimburse them for his plane ticket to Iowa and . . . to cover rent.").

34

that defendants participated in a scheme to defraud, they fail to describe the scheme – including any knowledge or acquiescence each defendant had of the alleged misrepresentations made to plaintiffs. While knowledge may be alleged generally, plaintiffs have failed to allege any facts related to each defendant's knowledge. *See Iqbal*, 556 U.S. at 686-87 ("Rule 9 merely excuses a party from pleading discriminatory intent under an elevated pleading standard. It does not give him license to evade the less rigid – though still operative – strictures of Rule 8.").

Plaintiffs' allegations do not satisfy the particularity requirement of Rule 9(b) and fail to provide each defendant with sufficient notice of its alleged fraudulent conduct. *See Wright v. Brooke Group Ltd.*, 114 F. Supp. 2d 797, 832 (N.D. Iowa 2000) (noting when a complaint "accuses multiple defendants of participating in the scheme to defraud, the plaintiffs must take care to identify which of them was responsible for the individual acts of fraud."). As such, Count VIII fails to state a claim upon which relief may be granted.

### H.    Count IX – Negligent Misrepresentation

Defendants argue that plaintiffs' negligent misrepresentation claim must be dismissed because plaintiffs fail to allege that any of the defendants are in the profession or business of supplying information or opinions. Plaintiffs acknowledge that this tort requires a defendant to be in the business or profession of supplying information for the guidance of others. However, they argue that an employer may be held liable for negligent misrepresentation.

The tort of negligent misrepresentation is described as follows:

one who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Barske v. Rockwell Int'l Corp.*, 514 N.W.2d 917, 924 (Iowa 1994). "[T]he tort of negligent misrepresentation does not apply to sellers of products but rather is limited to those in the business or profession of supplying information for the guidance of others." *Huck v. Wyeth, Inc.*, 850 N.W.2d 353, 371 (Iowa 2014). Those in the business of supplying information include professionals such as accountants, appraisers, school guidance counselors and investment brokers." *Id.* (citing *Pitts v. Farm Bureau Life Ins. Co.*, 818 N.W.2d 91, 111-12 (Iowa 2012)). "[T]he tort does not apply when a defendant directly provides information to a plaintiff in the course of a transaction between the two parties, which information harms the plaintiff in the transaction with the defendant." *Sain v. Cedar Rapids Sch. Dist.*, 626 N.W.2d 115, 126 (Iowa 2001).

Plaintiffs identify the following "particularities" that they allege defendants negligently represented to plaintiffs:

- That plaintiffs would not be responsible for paying tuition, fees or housing and that plaintiffs would be working no more than 32 hours per week. Doc. 15 at ¶ 216(a), (c), (d).

- That defendants failed to disclose the secret deductions which were withheld from plaintiffs' wages. *Id.* at ¶ 216(b).

- That J&L sent representatives to Chile and Brazil to recruit students for the J-1 visa program, which they negligently misrepresented as a "cultural exchange program."

Plaintiffs contend that J&L, as an employment agency, and Tur-Pak, Royal Canin and WITCC, as employers, may be held liable for negligent misrepresentation. *See* Docs. 61 at 44; 62 at 42 (citing *Barske v. Rockwell Int'l Corp.*, 514 N.W.2d 917 (Iowa 1994) and *Pollmann v. Belle Plaine Livestock Auction, Inc.*, 567 N.W.2d 405 (Iowa 1997) for the proposition that employers may be held liable for negligent misrepresentation).

*Barske* and *Pollmann* do not support a claim of negligent misrepresentation against these defendants. In *Barske*, former employees sued their employer for breach of contract and fraudulent and negligent misrepresentation claiming that, during job interviews and

36

at orientation sessions, they were told their employment would be for a period of at least three to five years when in fact, it ended up being less than three years. Defendant did not challenge the negligent misrepresentation claim on the basis that it was not in the business of supplying information. Thus, the court did not address the issue. *See Barske*, 514 N.W.2d at 920. *Pollmann* similarly dealt with an employment contract that had been cut short. In that case, the defendant argued the negligent misrepresentation claim failed based on the justifiable reliance element. *Pollmann*, 567 N.W.2d at 409. Again, the court did not consider whether defendant was in the business of supplying information, as defendants have argued here.

None of the defendants are alleged to be in the business of supplying information or otherwise to have been in a special relationship with plaintiffs such that they owed them a duty of care in providing information. Plaintiffs have cited no case law demonstrating that any person or entity similar to defendants may be held liable for the tort of negligent misrepresentation under Iowa law. Count IX fails to state a claim upon which relief may be granted.

## I. *Count X – Unjust Enrichment*

A claim of unjust enrichment requires proof that (1) the recipient was enriched by the receipt of the benefit; (2) the enrichment was at the expense of the provider; and (3) it is unjust to allow the recipient to retain the benefit under the circumstances. *Waldner v. Carr*, 618 F.3d 838, 848 (8th Cir. 2010).

Plaintiffs allege defendants were unjustly enriched because they did not fully compensate plaintiffs for the hours they worked and withheld secret deductions from plaintiffs' wages. Doc. 15 at ¶¶ 220-24. Defendants Royal Canin and Tur-Pak argue that plaintiffs fail to allege how they were unjustly enriched, noting Royal Canin and Tur-Pak allegedly paid $15 per hour for plaintiffs' work, with plaintiffs receiving $7.25 per hour and the rest going to WITCC and J&L. Plaintiffs respond that the FAC alleges the following benefits to Tur-Pak and Royal Canin:

37

153.    Defendants Tur-Pak and Royal Canin were compensated with guaranteed workers who could not quit or even take a sick day without fear of retaliation

157.    Defendants knowingly obtained the labor and services of Plaintiffs by means of the abuse or threatened abuse of the law or legal process

161.    Defendants Royal Canin and Tur-Pak failed to pay Plaintiffs all wages due and failed to pay Plaintiffs time and a half for hours exceeding 40 per week

165.    Defendants unlawfully withheld deductions from Plaintiffs' paychecks and diverted them to Defendants J&L Staffing and WITCC

171.    Plaintiffs were paid significantly less than American employees in the same positions and had unlawful deductions withheld from their paychecks

180.    Defendants Royal Canin and Tur-Pak made fraudulent unlawful deductions from the Plaintiffs' paychecks and gave portions of those deductions to Defendants WITCC and J&L Staffing.

These allegations are sufficient to state a plausible claim of unjust enrichment against Tur-Pak and Royal Canin.

As to the other defendants, WITCC argues that an unjust enrichment claim cannot survive where an express contract exists as to the same subject matter. Even if the claim is not barred by the existence of a contract, WITCC argues plaintiffs' allegation that defendants made secret deductions from plaintiffs' wages is insufficient. It adds that plaintiffs do not plead they were promised a certain wage or pay amount nor that they were contractually entitled to other benefits. It also notes that plaintiffs allege they were provided (for a time) with food, transportation, lodging and education.

I decline to dismiss Count X as to WITCC on the basis that the matter is covered by an express contract. While the existence of a contract may preclude a claim of unjust enrichment, I cannot determine at this time whether an express contract covers the

issue(s) for which plaintiffs claim unjust enrichment.[12]  *See Meardon v. Register*, 994 F.3d 927, 936-37 (8th Cir. 2021) (when it was undisputed that an express contract existed between the parties on an issue, an unjust enrichment claim failed as a matter of law but where the parties disputed the existence of an enforceable oral contract, plaintiffs could plead unjust enrichment as an alternative to a breach of contract claim).  With regard to the sufficiency of the allegations, WITCC seems to argue that it did not receive any benefit from plaintiffs' alleged wage deductions because WITCC provided plaintiffs with food, transportation, lodging and education.  The value of these items, and whether WITCC was justified in retaining any of plaintiffs' alleged wages, are issues better addressed on summary judgment.  At this stage, plaintiffs have sufficiently stated a claim of unjust enrichment against WITCC.

As for J&L and Albrecht, they argue it is unclear how J&L and Albrecht were able to make "secret deductions" from wages when there is no allegation that J&L employed plaintiffs.  Even if J&L was plaintiffs' employer, it argues plaintiffs cannot allege they were not fully compensated when they received the federal minimum wage and have not pointed to any agreement, contract, promise, statute, rule or law that entitled them to more than that.  J&L notes that staffing companies are entitled to be paid for their services in placing workers at their clients' businesses and therefore, were not unjustly enriched.

All of J&L's arguments go beyond the pleadings.  First, it is not necessary for J&L and Albrecht to be plaintiffs' employer in order for plaintiffs to allege unjust enrichment against them.  Even so, plaintiffs' FAC is ambiguous as to whether they are claiming J&L was an employer.  Second, plaintiffs' minimum wage payment also does not preclude them from alleging unjust enrichment.  As noted above, plaintiffs allege not

---

[12] Plaintiffs have attached acceptance letters to their first amended complaint that they allege constitute written contracts between them and WITCC.  It is not clear whether these are the express contracts that WITCC argues bar plaintiffs' unjust enrichment claims.

only that defendants unlawfully withheld deductions from their paychecks, but that they were also not paid overtime wages. While J&L suggests that deductions from plaintiffs' paychecks were actually payments for J&L's services, this is an issue for summary judgment. J&L and Albrecht have not identified any appropriate bases on which to dismiss Count X against them. As such, their motion to dismiss Count X will be denied.

Because plaintiffs' allegations state a plausible claim of unjust enrichment as to each defendant, defendants' motions to dismiss Count X will be denied.

**J.      Count XI – Breach of Contract Against WITCC**

WITCC argues plaintiffs fail to identify any specific contract provisions that the WITCC defendants allegedly breached. They argue plaintiffs rely on conclusory allegations, including the alleged damages they suffered, and have therefore failed to state a cognizable claim.

To prevail on a breach of contract claim, a plaintiff must prove:

(1) the existence of a contract, (2) the terms and conditions of the contract, (3) that [the claimant] has performed all the terms and conditions required under the contract, (4) the [opposing party's] breach of the contract in some particular way, and (5) that [the claimant] has suffered damages as a result of [the opposing party's] breach.

*Royal Indem. Co. v. Factor Mut. Ins. Co.*, 786 N.W.2d 839, 846 (Iowa 2010) (quoting *Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998)).

Plaintiffs cite Exhibits A through I of their FAC as the alleged written contracts at issue. They note these contracts demonstrate WITCC agreed to provide plaintiffs with an educational and cultural exchange experience through the J-1 visa program and that, under the contract terms, WITCC agreed to the following:

- Plaintiffs would participate in the J-1 visa program for the duration of one year, divided into three semesters

- Plaintiffs would not be responsible for paying tuition, fees, housing or supplies

- Defendant WITCC would provide meals to plaintiffs

- Defendant WITCC would supply plaintiffs with all necessary materials for classes and training

- Plaintiffs could not obtain paid internships off campus without permission from defendant WITCC

- Plaintiffs would be receiving hands-on professional training, related to their field of study in an external environment

Doc. 15 at ¶ 226-27. Plaintiffs allege defendants failed to tender performance as required by the contract in that plaintiffs were not provided with internships related to their field of study, were not provided with meals by WITCC and WITCC made secret deductions from plaintiffs' wages that they claim were used to pay for plaintiffs' tuition fees and housing at WITCC. *Id.* at ¶ 228. Plaintiffs allege they were damaged in that they were not given the education and professional skills promised, they were not fully compensated for the unskilled work they were performing and their mental and physical health suffered due to the excessive hours they were expected to work. Finally, plaintiffs set forth specific damages in paragraphs 229 and 230.

Plaintiffs have sufficiently stated a claim of breach of contract. They have identified the alleged contracts and the provisions allegedly breached and have provided adequate notice of their claimed damages. WITCC's motion to dismiss Count XI will be denied.

### K.    *Count XII – Tortious Bad Faith Breach or Denial of Contract Claim Against WITCC*

WITCC argues Iowa law does not recognize a cause of action for tortious bad faith breach of contract or denial of contract in these circumstances. It states that bad faith contract actions are limited to matters related to insurance coverage, and even if for some

41

reason, they extended beyond that scope, plaintiffs have not identified any precedent recognizing such an action under the circumstances presented here. It also argues that such a claim would be duplicitous of plaintiffs' breach of contract claim and tortious infliction of emotional distress claim.

Plaintiffs acknowledge that Iowa law first adopted the tort of first-party bad faith in the insurance context to address unequal bargaining power between the insurer and insured, but argue that this policy reason extends to other contract actions, including the one presented here. The only case they cite in support is *Van Natta v. Sara Lee Corp.*, 439 F. Supp. 2d 911 (N.D. Iowa 2006). In that case, the plaintiffs alleged a bad faith breach of contract claim in an Employee Retirement Income Security Act (ERISA) lawsuit. *Van Natta*, 439 F. Supp. 2d at 929. The court stated that "Iowa courts have not confined common law, bad faith causes of action to the insurance industry" and that "it is a general law, applicable to the entire panoply of contracts." *Id.* The court found the bad faith claim was preempted by ERISA. Plaintiffs note they have pled the elements of breach of contract, that the parties had inherently unequal bargaining power, that defendants' breach was committed maliciously and that defendants intended to take advantage of plaintiffs.

The Iowa Supreme Court first recognized a first party bad faith tort claim in *Dolan v. Aid Ins. Co.*, 431 N.W.2d 790 (Iowa 1988), reasoning that this cause of action was "justified by the nature of the contractual relationship between the insurer and insured" because it did not involve the "same fiduciary duties as in third-party situations" and there is "inherently unequal bargaining power between the insurer and insured." *Id.* at 794. The Court has declined to expand the scope of the claim to an uninsured employer, noting that "central to imposing liability for bad faith was 'the traditional insurer/insured relationship.'" *Thornton v. Am. Interstate Ins. Co.*, 897 N.W.2d 445, 463 (Iowa 2017) (quoting *Bremer v. Wallace*, 728 N.W.2d 803, 805-06 (Iowa 2007)). The Court has recognized that the duty of good faith and fair dealing is unique in the insurance context because it "emanates from the special relationship which exists between the parties, not

42

necessarily from the terms of the contract." *Thornton*, 897 N.W.2d at 464 (quoting Mary G. Leary, 97 Am. Jur. Trials § 211 Westlaw (database updated May 2017)). Under Iowa law, "[a]n implied duty of good faith and fair dealing is recognized in all contracts." *Bagelmann v. First Nat. Bank*, 823 N.W.2d 13, 34 (Iowa 2012). This implied duty does not "give rise to new substantive terms that do not otherwise exist in the contract." *Id.* Therefore, any breach of this duty must be a breach of the contract and is actionable only as a breach of contract. *See Barnhouse v. Malvern Bank*, 1:20-cv-0003-HCA, 2020 WL 8225437, at *6 (S.D. Iowa June 23, 2020) ("The covenant is simply an implied contractual term, and like all contractual terms, its breach affords an action of breach of contract and corresponding contractual remedies.").

Because current Iowa law does not recognize any tort liability for breach of the implied covenant of good faith and fair dealing in contracts except in the case of insurance contracts, Count XII does not state a claim upon which relief may be granted.


**L.     *Count XIII - Tortious Infliction of Emotional Distress***

Defendants argue plaintiffs rely on a mere recitation of the elements of tortious infliction of emotional distress, fail to allege outrageous conduct or identify conduct that each defendant engaged in and have not sufficiently alleged how they suffered emotional distress beyond mere legal conclusions. Plaintiffs respond that they have alleged that defendants' unlawful acts and omissions went beyond the bounds of decency and beyond what can be tolerated by a civilized society and that such unlawful acts and omissions were extreme and outrageous. *See* Doc. 15 at ¶¶ 242-43. They cite the allegations relating to their TVPRA and RICO claims as allegations containing the requisite specificity of each defendant's conduct. They allege defendants knew their conduct would cause severe physical, psychological and/or emotional harm and that defendants acted with intentional and/or reckless disregard for causing that harm. *Id.* at ¶ 244.

43

A plaintiff must prove the following elements to prevail on a claim of intentional[13] infliction of emotional distress under Iowa law:

(1)     outrageous conduct by the defendant;

(2)     the defendant intentionally caused, or recklessly disregarded the probability of causing, the emotional distress;

(3)     plaintiff suffered severe or extreme emotional distress; and

(4)     the defendant's outrageous conduct was the actual and proximate cause of the emotional distress.

*Barreca v. Nickolas*, 683 N.W.2d 111, 123 (Iowa 2004) (quoting *Fuller v. Local Union No. 106*, 567 N.W.2d 419, 423 (Iowa 1997)). Outrageous conduct is conduct that is "so extreme in degree as to go beyond all possible bounds of decency" and is "regarded atrocious, and utterly intolerable in a civilized community." *Id.* "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor and lead him to exclaim, "Outrageous!" *Smith v. Iowa State University of Sci. and Tech.*, 851 N.W.2d 1, 26 (Iowa 2014) (quoting *Van Baale v. City of Des Moines*, 550 N.W.2d 153, 156-57 (Iowa 1996)). "[I]t is for the court to determine in the first instance, as a matter of law, whether the conduct complained of may reasonably be regarded as outrageous." *Smith*, 851 N.W.2d at 26 (quoting *Vinson v. Linn-Mar Cmty. Sch. Dist.*, 360 N.W.2d 108, 118-19 (Iowa 1984)).

"When evaluating claims of outrageous conduct arising out of employer-employee relationships, we have required a reasonable level of tolerance. Every unkind and inconsiderate act cannot be compensable." *Smith*, 851 N.W.2d at 26 (quoting *Vaughn v. Ag Processing, Inc.*, 459 N.W.2d 627, 636 (Iowa 1990)). In making the determination

---

[13] *See Northrup v. Farmland Indus., Inc.*, 372 N.W.2d 193, 197 (Iowa 1985) (noting that while Iowa cases refer to this claim as an "intentional infliction of emotional distress," neither the Restatement nor Iowa case law requires proof of an intentional act; a "reckless disregard of the probability of causing" emotional distress is enough).

of whether conduct is outrageous "the court should consider the relationship between the parties" such as whether the conduct arises "from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests." *Vinson*, 360 N.W.2d at 118 (quoting Restatement (Second) of Torts § 46, comment e (1965)). "It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort." *Id.*

I agree with defendants that plaintiffs' allegations in support of Count XIII are nothing more than a formulaic recitation of the elements. They contain no factual allegations concerning the alleged unlawful acts and omissions that were extreme and outrageous, nor do they incorporate by reference, other allegations within the FAC that they allege were extreme and outrageous. Like other parts of the FAC, these allegations fail to identify which defendants engaged in which conduct. The allegations fail to provide defendants with sufficient notice of the conduct plaintiffs rely on for this claim. Plaintiffs also do not allege any facts related to the alleged harm they suffered. They allege they suffered "severe mental and emotional harm and anguish, pain and suffering, psychological and emotional injuries, humiliation, embarrassment and loss of enjoyment of life." Doc. 15 at ¶ 245. These are conclusory allegations and are insufficient to meet the standard. *See Steckelberg v. Randolph*, 448 N.W.2d 458, 462 (Iowa 1989) ("Our cases that have found substantial evidence of emotional harm have had direct evidence of either physical symptoms of the distress or a clear showing of a notably distressful mental reaction caused by the outrageous conduct."); *Fenceroy v. Gelita USA, Inc.*, 941 N.W.2d 37, at *4-*5 (Iowa Ct. App. 2019) (concluding that allegations of fright, horror, shame, humiliation, embarrassment, anger, disappointment and worry were insufficient to state a claim of intentional infliction of emotional distress). Count XIII fails to state a claim upon which relief may be granted.

## M.	Should Plaintiffs Be Granted Leave to Amend?

All defendants request that the claims against them be dismissed with prejudice and without leave to amend. *See* Docs. 32-1 at 35; 33 at 36; 39-1 at 38; 74 at 19. Plaintiffs have not requested leave to amend any claim in the event the court grants defendants' motions. Plaintiffs also do not address defendants' arguments requesting dismissal with prejudice. Federal Rule of Civil Procedure 15(a)(2) provides that "a party may amend its pleading only with the opposing party's written consent or the court's leave" and that "[t]he court should freely give leave when justice so requires." In determining whether plaintiffs should be given leave to amend, I should consider:

> whether the pleader chose to stand on its original pleadings in the face of a motion to dismiss that identified the very deficiency upon which the court dismissed the complaint; reluctance to allow a pleader to change legal theories after a prior dismissal; whether the post-dismissal amendment suffers from the same legal or other deficiencies as the dismissed pleading; and whether the post-dismissal amendment is otherwise futile.

*Meighan,* 978 F. Supp. 2d at 982.

Permitting amendment for certain of the defective claims would be futile, as there appears to be no set of facts plaintiffs could allege that would entitle them to relief. However, other defective claims simply lack the level of specificity or detail necessary to put each defendant on notice of the alleged actions by that particular defendant that plaintiffs claim violate the law. Leave to amend will be denied as to the first set of claims and granted as to the second set. Counts falling within the second set are:

- Count I – Forced labor and trafficking for forced labor under the Trafficking Victims Protection Reauthorization Act (TVPRA), including violations of 18 U.S.C. §§ 1581, 1589, 1590, 1595 (against all defendants)

- Count II – Violations of 29 U.S.C. § 201, Fair Labor Standards Act for unpaid overtime wages (against defendants Royal Canin and Tur-Pak)

- Count III – Violations of the Iowa Wage Payment Collection Law (against Tur-Pak)

46

- Count VII – Denial of right to procedural and substantive due process under the Iowa State Constitution Article I, § 9 (against all defendants)

- Count VIII – Fraudulent misrepresentation (against all defendants)

- Count XIII – Tortious infliction of emotional distress (against all defendants)

Plaintiffs are granted leave to amend in order to cure the deficiencies as to these claims, if they so desire. By contrast, any attempt to amend with regard to Counts IV, V, VI (as against the non-WITCC defendants), IX and XII would be futile. Those counts will therefore be dismissed with prejudice.

## V.  CONCLUSION

For the reasons set forth herein, defendants' motions (Docs. 31, 32, 35 and 39) to dismiss are **granted** in part and **denied** in part, as follows:

1.  The motions are **denied** as to Counts VI (as against the WITCC defendants only), X and XI. Those claims will proceed as currently set forth in the First Amended Complaint (Doc. 15).

2.  The motions are **granted** as to Counts I, II, III, VII, VIII and XIII. Those claims are hereby **dismissed without prejudice**. Plaintiffs are granted leave to amend any or all of these claims, if they so choose. Any such amended pleading must be filed on or before **September 15, 2021.**

3.  The motions are also **granted** as to Counts IV, V, VI (as against all defendants except the WITCC defendants), IX and XII. Because I find that any attempt to amend those claims would be futile, they are hereby **dismissed with prejudice**.

47

**IT IS SO ORDERED.**

**DATED** this 16th day of August, 2021.

_____
Leonard T. Strand, Chief Judge