**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

| | |
|---|---|
| JACQUELINE DE BRITTO BUCCO, et al., | |
| Plaintiffs, | No. C21-4001-LTS |
| vs. | |
| WESTERN IOWA TECH COMMUNITY COLLEGE, et al., | **MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTIONS TO DISMISS** |
| Defendants. | |

## I. INTRODUCTION

This case is before me on motions (Docs. 87, 90, 93, and 98) to dismiss[1] filed by defendants Premier Services, Inc. d/b/a J&L Enterprises and d/b/a J&L Staffing and Recruiting (J&L) and Nancy Albrecht (together, the J&L defendants); Tur-Pak Foods, Inc. (Tur-Pak); Royal Canin USA, Inc. (Royal Canin); and Juline Albert, Rosana Salgado Burright, Lilly Castro, Terry Murrell, Terry Yi, James Zuercher and Western Iowa Tech Community College (WITCC) (together, the WITCC defendants). Plaintiffs have filed resistances (Docs. 108, 109, 110 and 111) and defendants have filed replies. *See* Docs. 114, 119, 120 and 123. Plaintiffs have also filed a notice (Doc. 106) of voluntary dismissal in which some plaintiffs dismiss certain claims against certain defendants. Oral argument is not necessary. *See* Local Rule 7(c).

---

[1] Defendants previously filed motions to dismiss, which I granted in part and denied in part and granted plaintiffs leave to amend some claims. *See* Doc. 76. Plaintiffs timely filed a Second Amended Complaint (Doc. 79), which is the subject of the instant motions to dismiss.

## II.    FACTUAL ALLEGATIONS

The following allegations from the Second Amended Complaint (SAC) (Doc. 79) are accepted as true for purposes of the motions to dismiss:

Plaintiffs are citizens of Brazil and participants in the J-1 visa program at WITCC. They allege that representatives of WITCC and J&L, including Burright (International Education Institute Specialist at WITCC), Albrecht (J&L Account Executive) and Albert (WITCC Vice-President) told plaintiffs that the J-1 visa program was a two-year program in which they would study at WITCC and complete internships overseen by J&L, which would be related to their field of study and at which they would work no more than 32 hours per week.  On February 21, 2019, Burright created a Facebook post directed to potential J-1 visa program students that stated the study programs offered were (1) robotics and industrial automation and (2) culinary arts.  She used the fact that she is Brazilian to influence plaintiffs and lead them to believe the program was legitimate. During the recruitment, application and interview process, Burright sent written correspondence to plaintiffs stating that J&L would place with them various "business/partners" for internships and that the students could not be called "workers" or use the words "salary" or "wages."  The June 3, 2019, acceptance letters to plaintiffs indicated they would not be responsible for the cost of tuition, fees, housing or supplies and that meals would be provided at WITCC.  The letters stated plaintiffs would receive internships in their field of study, described the tasks that were associated with those positions and listed the particular skills they would be able to perform after graduation.

In late spring/early summer of 2019, WITCC determined that J&L's involvement in the visa program could result in logistical problems, so Burright contacted plaintiffs via electronic messages and phone calls to instruct them to destroy all documents related to J&L and not to mention J&L during their visa interviews.  However, it was clear to plaintiffs that J&L would still be actively involved.  The formal invitation letters sent to plaintiffs fraudulently stated: "Western Iowa Tech will be responsible for your international flight to our Campus in Sioux City, Iowa.  You are **NOT** responsible for

2

the cost of your tuition, fees, housing, or supplies. Meals will be provided by the College." Doc. 79 at ¶ 37 (citing Doc. 79-10).

Plaintiffs arrived in the United States between July and September 2019. They were assigned housing by WITCC, to which WITCC representatives had full access at any time and were allowed to enter without plaintiffs' authorization. Plaintiffs were assigned jobs at either Royal Canin or Tur-Pak. Royal Canin manufactures high-end pet food and Tur-Pak packages and assembles food products. J&L employed all plaintiffs while Royal Canin and Tur-Pak also acted as employers for the plaintiffs who worked at each respective plant. Plaintiffs state the full nature of plaintiffs' employment is unknown at this time, but it is believed that J&L had an employer-employee relationship with plaintiffs and that Tur-Pak and Royal Canin may have been joint employers. During the recruitment process, Burright told plaintiffs that J&L would manage the places they were assigned to work and would determine how much plaintiffs earned. J&L, together with Royal Canin and Tur-Pak, placed plaintiffs in their job positions, supervised their work and had the power to hire and fire them. Plaintiffs began their jobs at various times between August and December 2019. Those jobs had no educational value and were completely unrelated to their intended fields of study.

The plaintiffs working at Royal Canin were told they were not allowed to work with any kind of technology or computers, even though WITCC and J&L promised to provide them with this type of work experience. Royal Canin also told plaintiffs that as J&L employees, they were not authorized to operate machinery or computers, but only to perform manual labor.

During the recruitment process, WITCC and J&L representatives told plaintiffs they would work no more than 32 hours a week. Plaintiffs state they were regularly expected to work up to 56 hours per week and that Burright told them if they were unable to work due to illness, they would be removed from the visa program. She also warned that if they did not work, "they" would not be able to afford food. Doc. 79 at ¶ 48. Yi threatened plaintiffs with deportation if they did not work. Royal Canin and Tur-Pak

3

paid $15 per hour for the labor plaintiffs provided, yet plaintiffs received only $7.25 per hour. The rest of their earnings went to WITCC and J&L. J&L would receive the funds from Royal Canin and Tur-Pak, pay WITCC and distribute the remainder to plaintiffs.

In October 2019, plaintiffs complained to Burright and Albert about not receiving the appropriate amount of overtime pay. Albert responded that she did not know why WITCC was receiving part of plaintiffs' overtime pay, and that it was a mistake, but did not correct the situation. Royal Canin paid $22.50 in overtime to J&L and plaintiffs received only $10.88 per hour of overtime pay. If a plaintiff obtained work outside the internship, WITCC asked that plaintiffs pay $250.00 towards room and board.

Plaintiffs were enrolled in classes at WITCC in the fall semester of 2019 but were segregated from the general student population and took classes only with other Brazilians and Chileans who were part of the J-1 visa program. Plaintiffs made repeated complaints to Burright about the program in fall 2019 and began trying to schedule meetings with Albert. Plaintiff Reis was able to secure a meeting and other J-1 students submitted questions through him about how long they would have to work to pay off their debt to WITCC and complaints about their work environment.

In November 2019, the United States Department of State investigated the J-1 visa program at WITCC and interviewed several participating students. Burright had coached plaintiffs on the appropriate answers to give, including making no mention of J&L or its involvement with the J-1 visa program. She also told them to report they were healthy and well and taken to the doctor when necessary. The State Department determined that plaintiffs' jobs were not proper J-1 visa program training placements and thus they could no longer work at Royal Canin and Tur-Pak. Burright told plaintiffs they could not work outside of WITCC. Because they were no longer working, plaintiffs did not have money to buy food and WITCC instructed them to utilize local food pantries. In late fall and early winter of 2019, Burright drove plaintiffs to pantries to collect donated food.

Plaintiffs' credit at WITCC's cafeteria was suspended and they sometimes went to local churches for meals. Plaintiffs Coutinho and Soares sold blood plasma for money

4

to buy food and necessities. Plaintiffs did not have the funds to return to Brazil on their own. They asked Burright for an accounting of how much they owed to WITCC and how much they had already paid for their work with J&L at Royal Canin and Tur-Pak, but Burright refused to provide this information. In a November 18, 2019, WhatsApp message, Burright stated that WITCC had no obligation to be accountable to plaintiffs for the amount they owed. She admitted that some of the deductions should not have been made. Plaintiffs were never reimbursed or given further explanation.

At a January 2020 meeting with WITCC representatives, Albert and Burright continued to refuse to answer plaintiffs' questions about overtime pay they were due, informed plaintiffs they would not earn a degree they had been promised and instructed that they would have to work for WITCC in whatever capacity WITCC chose at $7.25 per hour. Plaintiffs with jobs outside of WITCC were ordered to quit those jobs. WITCC ended the visa program in January 2020 and asked the students to vacate student housing in February and March of 2020.

The SAC describes circumstances unique to each of the 10 individual plaintiffs, including how they heard about the visa program, their intended fields of study, representations made to them about the program by WITCC and J&L representatives, where they worked, the nature of their work, their hours and pay and when they left WITCC housing.[2] *See* Doc. 79 at 12-45. The following claims from the SAC remain following plaintiffs' voluntary dismissal (Doc. 106) of some claims:

- Count I – Forced labor and trafficking for forced labor under the Trafficking Victims Protection Reauthorization Act (TVPRA), including violations of 18 U.S.C. §§ 1581, 1589, 1590, 1595 (against all defendants)

- Count II – Violations of 29 U.S.C. § 201, Fair Labor Standards Act (FLSA) for unpaid overtime wages (against defendants Royal Canin, Tur-Pak and J&L)

---

[2] These allegations contain additional details that were not in the first amended complaint. They will be discussed as relevant to plaintiffs' specific claims.

- Count III – Violations of the Iowa Wage Payment Collection Law (IWPCL) (against defendants Tur-Pak and J&L)

- Count V – Denial of right to procedural and substantive due process under the Iowa State Constitution Article I, § 9 (against WITCC, J&L and individual defendants)

- Count VI – Fraudulent misrepresentation (against WITCC, J&L and individual defendants)

- Count VII – Unjust enrichment (against all defendants)

- Count IX – Tortious infliction of emotional distress (against WITCC, J&L and individual defendants)

Doc. 79. J&L and WITCC seek dismissal of Counts I, V, VI and IX. Royal Canin seeks dismissal of Counts I, II and VII. Tur-Pak seeks dismissal of Counts I, II, III, and V.


### III. APPLICABLE STANDARDS

The Federal Rules of Civil Procedure authorize a pre-answer motion to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The Supreme Court has provided the following guidance in considering whether a pleading properly states a claim:

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." As the Court held in [*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007)], the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. *Id.*, at 555, 127 S. Ct. 1955 (citing *Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L.Ed.2d 209 (1986)). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." 550 U.S. at 555, 127 S. Ct. 1955. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.*, at 557, 127 S. Ct. 1955.

6

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.*, at 570, 127 S. Ct. 1955. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*, at 556, 127 S. Ct. 1955. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid*. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* at 557, 127 S. Ct. 1955 (brackets omitted).

*Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009).

Courts assess "plausibility" by "'draw[ing] on [their own] judicial experience and common sense.'" *Whitney v. Guys, Inc.*, 700 F.3d 1118, 1128 (8th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 679). Also, courts "'review the plausibility of the plaintiff's claim as a whole, not the plausibility of each individual allegation.'" *Id.* (quoting *Zoltek Corp. v. Structural Polymer Grp.*, 592 F.3d 893, 896 n.4 (8th Cir. 2010)). While *factual* "plausibility" is typically the focus of a Rule 12(b)(6) motion to dismiss, federal courts may dismiss a claim that lacks a cognizable *legal* theory. *See, e.g.*, *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013); *Ball v. Famiglio*, 726 F.3d 448, 469 (3d Cir. 2013); *Commonwealth Prop. Advocates, L.L.C. v. Mortg. Elec. Registration Sys., Inc.*, 680 F.3d 1194, 1202 (10th Cir. 2011); *accord Target Training Intern., Ltd. v. Lee*, 1 F. Supp. 3d 927 (N.D. Iowa 2014).

In considering a Rule 12(b)(6) motion to dismiss, ordinarily the court "cannot consider matters outside the pleadings without converting the motion into a motion for summary judgment." *McMahon v. Transamerica Life Ins.*, No. C17-149-LTS, 2018 WL 3381406, at *2 n.2 (N.D. Iowa July 11, 2018); *see* Fed. R. Civ. P. 12(b)(6). On the other hand, when a copy of a "written instrument" is attached to a pleading, it is considered "a part of the pleading for all purposes," pursuant to Federal Rule of Civil Procedure 10(c). Thus, when the pleadings necessarily embrace certain documents, I

may consider those documents without turning a motion to dismiss into a motion for summary judgment.  *Id.*

When a complaint does not state a claim for relief that is plausible on its face, the court must consider whether it is appropriate to grant the pleader an opportunity to replead.   The rules of procedure permit a party to respond to a motion to dismiss by amending the challenged pleading "as a matter of course" within 21 days.  *See* Fed. R. Civ. P. 15(a)(1)(B).   Thus, when a motion to dismiss highlights deficiencies in a pleading that can be cured by amendment, the pleader has an automatic opportunity to do so.  When the pleader fails to take advantage of this opportunity, the question of whether to permit an amendment depends on considerations that include:

> whether the pleader chose to stand on its original pleadings in the face of a motion to dismiss that identified the very deficiency upon which the court dismissed the complaint; reluctance to allow a pleader to change legal theories after a prior dismissal; whether the post-dismissal amendment suffers from the same legal or other deficiencies as the dismissed pleading; and whether the post-dismissal amendment is otherwise futile.

*Meighan v. TransGuard Ins. Co. of Am.,* 978 F. Supp. 2d 974, 982 (N.D. Iowa 2013).

## IV.    ANALYSIS

### A.    *Count I – Violations of TVPRA*

Following plaintiffs' voluntary dismissal of some claims against some defendants, plaintiffs Bucco, Melo and Soares maintain their claims under Count I against Tur-Pak, WITCC, J&L and individual defendants while plaintiffs Bucco, Coutinho, Costa, Magalhaes, Melo, Pinto, Reis and Rosa maintain their claims under Count I against Royal Canin, WITCC, J&L and individual defendants.  Defendants argue plaintiffs' SAC fails to cure the defects identified in the order on defendants' previous motions to dismiss. *See* Doc. 76 at 6-14.  In that order, I found that plaintiffs failed to allege sufficient facts that each defendant knew or should have known they were participating in a venture that engaged in acts in violation of chapter 77.  *Id.* at 12.  I also found that plaintiffs had

failed to state a claim of peonage under 18 U.S.C. § 1581 because it was unclear to which defendant(s) plaintiffs owed a debt and which defendant(s) intentionally held them against their will and coerced them into working. *Id.* at 14.

As noted in my previous order, plaintiffs have alleged three different claims within Count I:

- Forced labor under § 1589
- Trafficking under § 1590
- Peonage under § 1581

Section 1589 provides:

(a) Whoever knowingly provides or obtains the labor services of a person by any one of, or by any combination of, the following means—

(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

(2) by means of serious harm or threats of serious harm to that person or another person;

(3) by means of the abuse or threatened abuse of law or legal process; or

(4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint,

shall be punished as provided under subsection (d).

(b) Whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means, shall be punished as provided in subsection (d).

9

18 U.S.C. § 1589. "Serious harm" is defined as "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2). "Abuse or threatened abuse of law or legal process" is defined as "the use or threatened use of a law or legal process . . . in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action." 18 U.S.C. § 1589(c)(1). The trafficking provision in § 1590 makes it a crime to "knowingly recruit[], harbor[], transport[], provide[], or obtain[] by any means," a person for forced labor. 18 U.S.C. § 1590(a).

The TVPRA provides a civil remedy under section 1595, stating:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. § 1595. Claims under section 1590 and 1595 require plaintiffs to sufficiently allege a predicate offense under section 1589. Section 1581 provides:

> Whoever holds or returns any person to a condition of peonage, or arrests any person with the intent of placing him in or returning him to a condition of peonage, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1581. I will address plaintiffs' forced labor and trafficking claims followed by their peonage claim.

10

### 1.  *Forced Labor and Trafficking*

Defendants argue: (1) plaintiffs' allegations do not rise to the level of abuse of law or legal process, (2) the only "serious harm" alleged is deportation, which is a legitimate consequence of failing to meet the requirements of the J-1 visa program and (3) that WITCC was the J-1 visa sponsor and the other defendants lacked the requisite knowledge concerning WITCC's conduct.

### a.  *Serious Harm, Threats of Serious Harm or Abuse or Threatened Abuse of Law or Legal Process*

I previously concluded that "[t]aking plaintiffs' allegations as true, they have sufficiently alleged abuse or threatened abuse of legal process under subsection 1589(a)(3) or a scheme intended to cause plaintiffs to believe they would face serious harm under subsection 1589(a)(4) by alleging that defendants threatened them with deportation if they missed work." Doc. 76 at 11. Defendants continue to challenge this aspect of plaintiffs' forced labor and trafficking claims, arguing that the alleged "threats" of deportation were merely factual statements regarding failure to meet the requirements of the J-1 visa program, in which plaintiffs voluntarily participated. They note that plaintiffs knew and agreed to return to their home country at the conclusion of the visa program and cannot plausibly allege they were threatened into continued work when they knew that work was a required component of the J-1 visa program. Defendants also challenge *who* made the alleged threats, pointing out that plaintiffs lump all of defendants together, but when describing specific conduct, allege only that WITCC and J&L (and their representatives) engaged in threats.

Plaintiffs have sufficiently alleged threats of serious harm or abuse or threatened abuse of law or legal process in the SAC. As noted in my previous order, courts have determined, in other contexts, that threats of deportation are sufficient to meet the "serious harm" element under either § 1589(a)(2) or (4) or "abuse of the legal process" element under § 1589(a)(3). *See* Doc. 76 at 10 (citing cases). Defendants argue that the

11

threat of deportation cannot constitute a legitimate threat of abuse of the legal process because work was a requirement of the J-1 visa program and it was only a two-year program. This misses the point, which is whether plaintiffs were intimidated and coerced into continuing to work and whether defendants intended to cause the plaintiffs to believe they would face serious harm or legal consequences if they did not continue to work. Moreover, defendants' argument assumes that the work plaintiffs were performing was a legitimate "requirement" of the J-1 visa program. Based on the State Department's determination, it was not.

Plaintiffs argue they were being coerced into performing hard, manual labor that was outside their field of study and contrary to what they were promised. It would not have been unreasonable for plaintiffs to believe that because this aspect of the program was not what had been promised to them, the length of the program may also have been a misrepresentation. Whether plaintiffs could actually be deported for missing work, or had expected to return to their home country after two years, is beside the point. *See Aragon v. Che Ku*, 277 F. Supp. 3d 1055, 1069 (D. Minn. 2017) ("Threatening employees with immigration consequences in order to prevent them from leaving employment constitutes a 'threatened abuse of the legal process' under Section (a)(3) of the TVPRA."); *Ramos-Madrigal v. Mendiola Forestry Service, LLC*, 799 F. Supp.2d 958, 960 (W.D. Ark. 2011) ("Threatening H-2B workers with serious immigration consequences in order to prevent them from leaving employment constitutes 'threatened abuse of the legal process' and states a valid claim pursuant to the TVPRA."). Plaintiffs have sufficiently alleged that defendants obtained labor using means described under § 1589(a)(2), (3) or (4).

### b. Knowledge

Under § 1589(b), defendants must: (1) "knowingly benefit financially or by receiving anything of value from" (2) participation in a venture they knew or should have known has engaged in providing or obtaining of labor or services by any means described

12

in subsection (a). In my previous order, I concluded plaintiffs sufficiently alleged that all defendants had knowledge of the financial or value benefit. *See* Doc. 76 at 12. However, I concluded that it was not clear from the FAC the extent to which Royal Canin and Tur-Pak knew or should have known that they were participating in a venture that engaged in acts in violation of chapter 77. *Id.* Plaintiffs had alleged that Royal Canin and Tur-Pak paid WITCC and J&L for plaintiffs' labor, but it was unclear whether WITCC and J&L had engaged in threats of the abuse of the legal process, or knew or recklessly disregarded that other defendants had engaged in such acts, or the extent of their knowing involvement in any "scheme" to make plaintiffs believe they would face serious harm if they stopped working. *Id.* I found it was also unclear whether plaintiffs were alleging that J&L and WITCC had engaged in threats of deportation or had knowledge or reckless disregard of any such threats or scheme by others in the alleged venture. *Id.* at 13.

Again, I find that plaintiffs have sufficiently alleged that each defendant knowingly benefitted under the first knowledge requirement of § 1589(b). *See* Doc. 76 at ¶ 332. As to whether each defendant knew or should have known about the means under subsection (a) by which the venture provided or obtained labor, plaintiffs allege the following in the SAC:

> 331. By recruiting Plaintiffs for WITCC's J-1 Visa Program, Defendants recruited, transported, provided, or obtained Plaintiffs for labor or services.

> 333. Defendants told Plaintiffs the J-1 Program was an educational cultural exchange program, and that they would study and work in an internship related to their field of study.

> 334. Defendants knowingly placed Plaintiffs in unskilled labor positions, which are not permitted under the J-1 Visa Program requirements, rather than placing them in internships related to their fields of study.

> 335. Defendants Royal Canin and Tur-Pak paid Defendants WITCC and J&L for the Plaintiffs' labor.

13

336. Defendants Royal Canin and Tur-Pak knowingly obtained the labor and services of Plaintiffs by means of the abuse or threatened abuse of the law or legal process or recklessly disregarded the fact that the other Defendants had engaged in such acts when interacting with Plaintiffs and the other Defendants.

337. Defendant Burright made repeated statements that the business affiliates which J&L and/or WITCC would be partnering with (presumably Royal Canin and Tur-Pak) were lacking sufficient numbers of workers.

338. Defendants Royal Canin and Tur-Pak were aware of and participated in the unauthorized deductions from Plaintiffs' paychecks that were paid to WITCC and J&L.

339. Defendants Royal Canin and Tur-Pak were aware of and participated in the failure to appropriately pay Plaintiffs for overtime.

340. Defendants Royal Canin and Tur-Pak knew or recklessly disregarded the means by which they obtained labor through the venture with WITCC and J&L.

*Id.; see also id.* at ¶ 85 ("[e]ven when she was sick and feverish, WITCC, and J&L representatives, including Defendants Burright and Albrecht, and Tur-Pak management told Plaintiff Bucco she had to go to work."); ¶ 202 ("WITCC, J&L, Tur-Pak, and Royal Canin representatives, including Defendants Albrecht, Burright, and Albert, told Plaintiff Melo that he had to work, despite the harsh working conditions and number of hours required, which were more than had been represented to him during the recruitment process.").

In order to meet the second knowledge requirement, plaintiffs must allege that each defendant knew or should have known that the venture provided or obtained labor from plaintiffs by either: "means of serious harm or threats of serious harm to that person or another person"; "means of the abuse or threatened abuse of law or legal process"; or "means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint." 18 U.S.C. § 1589(a)(2)-(4). With regard to

14

defendants Royal Canin and Tur-Pak, plaintiffs' allegations of such knowledge (or reckless disregard) are either conclusory, *see* Doc. 79 at ¶¶ 336, 340, or aimed at aspects of the alleged "scheme" that do not constitute means or threats of serious harm or abuse or threatened abuse of the law or legal process. Doc. 79 at ¶¶ 337, 338-39. For instance, plaintiffs focus on Royal Canin's and Tur-Pak's knowledge of unauthorized deductions to plaintiffs' paychecks and failure to pay overtime, but these do not include any knowledge or reckless disregard of the "means" to coerce plaintiffs into working as described under § 1589(a). Plaintiffs also allege that Royal Canin and Tur-Pak representatives told plaintiffs they had to work, *see* ¶¶ 85, 202, but these allegations do not include any threats of serious harm or abuse of the legal process. Allegations regarding threats of deportation or withholding money for food and housing are limited to defendants WITCC and J&L and their representatives:

48.    Defendant Burright repeatedly told Plaintiffs that if they were sick and unable to work, they would be removed from the J-1 Visa Program. Defendant Burright warned Plaintiffs that if they did not work, they would not be able to afford food.

49.    Once each Plaintiff began their actual work at Royal Canin and/or Tur-Pak and through the end of 2019, Defendant Yi also threatened Plaintiffs that if they did not work, they would be deported.

77.    After Plaintiffs started working, WITCC stopped giving them gift cards. Plaintiffs, who were struggling to buy food, were told by Defendant Burright to go to the local food pantry.

180.    Defendant Albrecht was well known among the J-1 students for threatening to move them to Tur-Pak or send them back to Brazil if they complained about working conditions.

181.    Plaintiff Magalhaes was not given access to WITCC's cafeteria, but instead provided with weekly $50 gift certificates to buy food and necessities. Once he began working, he no longer received the gift cards.

205.    WITCC no longer provided Plaintiff Melo with gift cards for food. Plaintiff Melo attempted to share food with another student, but there was

never enough, and he suffered hunger. Defendant Burright took him to food pantries where he was given food that had passed its expiration dates.

226. Defendant Albrecht threatened to send [Pinto] back to Brazil if he did not work.

256. Defendants Albrecht and Burright told Plaintiff Reis that he could not miss a single day of work, even if he was ill, or he would be fired, expelled from the program, and deported to Brazil.

309. Once Plaintiff Soares began working, WITCC quit providing her with the weekly $50 Wal-Mart gift cards meant to cover her food and necessities.

311. Defendants Burright and Albrecht told Plaintiff Soares that she would be sent back to Brazil if she was unable to work.

319. Plaintiff Soares also understood later that deductions were taken from her paycheck for housing, but she did not know the amount because she was never given that information.

326. Defendant Albert also stated that any J-1 student working outside of WITCC should leave those jobs immediately. Students caught working such outside jobs would be expelled and deported.

Doc. 79.[3] These allegations sufficiently allege that defendants WITCC and J&L and the individual defendants knew or should have known of the means under § 1589(a) by which the venture provided or obtained plaintiffs' labor. However, the SAC fails to allege that

---

[3] The only allegation that comes close to suggesting that Royal Canin or Tur-Pak knew or should have known that the venture had provided or obtained plaintiffs' labor through the means described in § 1589(a) is paragraph 96. Plaintiffs allege that in January 2020, Defendant Albert told Bucco that she could no longer work at Royal Canin due to the anonymous complaint that was made to the State Department. Doc. 79 at ¶ 96. They allege that Bucco was told by Mike Martinez, the operations manager at Royal Canin, and Defendant Albrecht that she would be sent back to Brazil. This is insufficient to establish that Royal Canin knew or should have known that Bucco had previously been threatened with deportation to coerce her into continued work at Royal Canin. When Martinez made his alleged statement, the program had been shut down and the statement does not reveal what Royal Canin knew or should have known about the means by which Bucco came to work and continued to work at Royal Canin up to that point.

16

defendants Royal Canin and Tur-Pak knew or should have known of the same. There are no alleged facts that Royal Canin or Tur-Pak knew or should have known that plaintiffs were being coerced and intimidated into working through threats of serious harm or abuse of the legal process. As such, plaintiffs have sufficiently stated a claim of forced labor under § 1589 as to the WITCC and J&L defendants. However, their forced labor claims against Royal Canin and Tur-Pak will be dismissed.

With regard to plaintiffs' trafficking claims under § 1590, plaintiffs also fail to state a claim against Royal Canin and Tur-Pak. Section 1590 makes it a crime to "knowingly recruit[], harbor[], transport[], provide[], or obtain[] by any means, any person for labor or services in violation of this chapter." 18 U.S.C. § 1590(a). Thus, it requires a predicate offense under § 1589 or some other section under chapter 77. For the reasons stated above, plaintiffs fail to allege that Royal Canin or Tur-Pak knew or should have known of the means by which plaintiffs' labor had been obtained. *See also* 18 U.S.C. § 1595 (noting civil liability may be imposed on "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter."). As such, plaintiffs' claim of trafficking under § 1590 will be dismissed as to defendants Royal Canin and Tur-Pak.

### 2. *Peonage*

Defendants make many of the same arguments with regard to plaintiffs' peonage claim under § 1581. Tur-Pak and Royal Canin argue plaintiffs' allegations refer only to a debt to WITCC and that the individual defendants associated with WITCC and J&L made statements that coerced plaintiffs into working. With regard to the knowledge element, they argue a conclusory allegation that all defendants "were knowingly involved in a scheme" is insufficient. Defendants WITCC and J&L argue any statements about deportation were not threats of harm but factual statements regarding the requirements of the J-1 visa program.

Plaintiffs argue they have sufficiently pled a claim of peonage because they have alleged that defendants told them they would supply them with food, housing, education and employment opportunities and in exchange, and as a condition of participating in the J-1 visa program, plaintiffs were obligated to work at the jobs assigned to them by defendants. They allege plaintiffs were indebted to defendants due to their participation in the program. They allege that defendants were part of a scheme that served to indenture the plaintiffs and describe the ways that each defendant benefited from the scheme. They contend plaintiffs continued to try to meet defendants' labor demands based on their obligation or debt combined with the threat of deportation and the threatened withholding of food and housing. Because plaintiffs depended on defendants for their basic needs, they were forced to continue working.

As stated in my previous order, the Eighth Circuit has summarized the law concerning peonage as follows:

> Peonage is 'compulsory service in payment of a debt.' *Bailey v. Alabama*, 219 U.S. 219, 242 (1911). '[C]ompulsory service' is the equivalent of 'involuntary servitude,' *id.* at 243, which the Supreme Court has defined as 'a condition of servitude in which the victim is forced to work for the defendant by the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process.' *United States v. Kozminski*, 487 U.S. 931, 952 (1988). Thus, in order to prove peonage, the government must show that the defendant intentionally held a person against his or her will and coerced that person to work in order to satisfy a debt by (1) physical restraint or force, (2) legal coercion, or (3) threats of legal coercion or physical force. *See id.* at 952-53. In determining whether 'physical or legal coercion or threats thereof could plausibly have compelled the victim to serve,' the jury is entitled to consider 'evidence of other means of coercion, or of poor working conditions, or of the victim's special vulnerabilities.'

*United States v. Farrell*, 563 F.3d 364, 372 (8th Cir. 2009). In other words, there are two requirements: (1) coercion to work against one's will (2) to discharge a debt owed.

In my previous order, I noted that plaintiffs "may have sufficiently alleged they were required to work to pay off a debt in the form of food, housing or education" but

18

that it was "unclear to which defendant(s) they owed such debt." Doc. 76 at 14. J&L, Royal Canin and Tur-Pak all argue that to the extent plaintiffs have remedied this in the SAC, they have alleged only that they owed a debt to WITCC and not any other defendant. I agree that plaintiffs' claims against Royal Canin and Tur-Pak must fail because plaintiffs have not alleged that Royal Canin and Tur-Pak ever promised anything to them in exchange for their work or ever coerced plaintiffs into continued work via threats of deportation or otherwise. As such, plaintiffs' peonage claims against Royal Canin and Tur-Pak will be dismissed.

With regard to the other defendants, plaintiffs have sufficiently alleged that they owed a debt to WITCC and that the WITCC defendants threatened plaintiffs with deportation, which the Supreme Court has recognized as legal coercion.[4] *See* Doc. 79 at ¶¶ 26, 27, 29, 30, 31, 37, 40, 42, 48, 49, 50, 55, 63, 92, 178, 256, 326. With regard to the J&L defendants, plaintiffs do not allege they owed a debt to J&L but allege that the J&L defendants coerced them into working by threatening deportation. *Id.* at ¶ 178, 180, 226, 256, 311. The case law interpreting § 1581 does not require that the alleged debt must be owed to the defendant.[5] *See Bailey v. Alabama*, 219 U.S. 219, 242 (1911) (defining peonage as "compulsory service in payment of a debt."). Plaintiffs sufficiently allege that the J&L defendants' coercion was aimed at the same alleged "debt" that plaintiffs believed they owed to WITCC. Plaintiffs' allegations suggest they had reason to believe that J&L was working on WITCC's behalf or in conjunction with WITCC.

---

[4] *See United States v. Kozminski*, 487 U.S. 931, 948 (1988) ("threatening . . . an immigrant with deportation could constitute the threat of legal coercion that induces involuntary servitude.").

[5] I disagree with J&L that *Turner v. Unification Church*, 473 F. Supp. 367, 375 (D.R.I. 1978) stands for the proposition that indebtedness "to the defendant" is an essential element of a peonage claim. Rather, *Turner* states: "An indispensable element of peonage is indebtedness to the master" and notes the complaint failed to allege plaintiff's servitude was based upon her indebtedness. *Turner*, 473 F. Supp. at 375. Courts have recognized a peonage claim against defendants based on a debt owed to a different defendant. *See Stein v. World-Wide Plumbing Supply, Inc.*, 71 F. Supp.3d 320, 328 (E.D.N.Y. 2014) (noting the facts focused on the conduct of four defendants who allegedly told plaintiff she owed a debt to one of the defendants).

*See id.* at ¶¶ 26, 70-71, 109-10, 114-15 140, 162, 165-66, 216, 246, 268-69, 294, 297-98 (describing that Albrecht traveled to Brazil and participated in recruiting and interviewing plaintiffs for work positions); *id.* at ¶¶ 40-42, 50, 79, 143, 171, 221, 247, 257-58, 306-07 (describing that J&L placed plaintiffs in their jobs and collected portions of plaintiffs' paychecks). Plaintiffs have sufficiently stated a claim of peonage under § 1581 as to the WITCC and J&L defendants.

**B.    Count II - FLSA Claims**

Plaintiffs allege a violation of the FLSA against defendants Royal Canin, Tur-Pak and J&L for failure to pay overtime and withholding funds from their paychecks. J&L does not seek dismissal of this claim at this time. *See* Doc. 95 at 1 (requesting dismissal of all claims against them other than Counts II, III and VII). Defendants Royal Canin and Tur-Pak argue that the SAC does not cure the deficient, ambiguous allegations identified in the FAC.

In my previous order, I found plaintiffs alleged sufficient facts in support of their claims regarding lack of overtime payments. Doc. 76 at 17. However, I found that plaintiffs failed to sufficiently identify their employer(s) or facts that described the "economic reality" of their employment, such as who they reported to, who had the right to hire or fire, the source of their work schedules and the information they were given at the start of their employment. *Id.* at 18.

The SAC alleges:

- Plaintiffs were employed by Royal Canin, Tur-Pak and/or J&L, identifying which plaintiffs worked at which facility. *See* Doc. 79 at ¶¶ 350-52.

- "The exact and full contractual nature of Plaintiffs' employment, as shared among J&L (a staffing agency), Royal Canin (a private party contracting with a staffing agency) and/or Tur-Pak (a private party contracting with a staffing agency), is unknown at this time. It is believed that J&L had a legally recognized employer-employee relationship with Plaintiffs based on its contracts with Tur-Pak and Royal Canin. It is also possible that Tur-Pak and/or

Royal Canin were Plaintiffs' employers jointly with J&L." *Id.* at ¶ 353.

- That Royal Canin, Tur-Pak and/or J&L:

  o were plaintiffs' employers within the meaning of 29 U.S.C. § 201;
  o had the right to control the nature and quality of work plaintiffs performed;
  o had representatives who were plaintiffs' direct, on-site supervisors;
  o had representatives train the plaintiffs who worked for them and give them direction on how to perform work tasks;
  o had the right to hire, fire, discipline, demote, or promote the plaintiffs who worked for them;
  o set work schedules for plaintiffs who worked for them;
  o issued paychecks to the plaintiffs. *Id.* at ¶¶ 354-61.

Royal Canin and Tur-Pak point out that elsewhere in the SAC, plaintiffs admit that J&L employed plaintiffs. *See id.* at ¶ 41 ("J&L employed all Plaintiffs, and Royal Canin and/or Tur-Pak were the employers of those Plaintiffs that worked at the Royal Canin or Tur-Pak locations, respectively" and acknowledging that the full contractual nature is unknown at this time). They also note that allegations pertaining to individual plaintiffs indicate that plaintiffs signed employment contracts and documents with J&L and that J&L was responsible for creating work schedules and paying plaintiffs. They contend that plaintiffs fail to sufficiently allege they were joint employers with J&L because the "economic reality" factors suggest that J&L was the sole employer. To the extent plaintiffs make allegations against all three defendants, Royal Canin and Tur-Pak argue plaintiffs engage in impermissible group pleading and merely recite the elements (or, in this case, the "economic reality" factors) without offering specific facts. With regard to overtime, Royal Canin points out that plaintiffs admit it paid $22.50 in overtime. *Id.* at ¶ 52 ("Royal Canin paid $22.50 in overtime to J&L, but the Plaintiffs who worked there received just $10.88 in overtime.").

Plaintiffs allege that defendants made it more difficult to determine the precise nature of any contractual employment relationship because plaintiffs were instructed to

21

destroy evidence of, and keep secret, J&L's involvement in their recruitment and employment. *Id.* at ¶¶ 36, 167, 218, 251. They also identify specific paragraphs in the SAC that describe the "economic realities" of their work with defendants. With regard to overtime payments, plaintiffs' argument is that they did not receive the amount due to them or that defendants did not pay on all the overtime hours actually worked.

I find that the SAC sufficiently alleges that Royal Canin and Tur-Pak were employers or joint employers with J&L within the meaning of the FLSA. In describing the economic realities, plaintiffs allege that all three defendants placed plaintiffs in their job positions, supervised their work and had the power to hire and fire them. *Id.* at ¶ 43. Plaintiffs provide some specific details, such as Royal Canin telling plaintiffs they were not allowed to work with any kind of technology or computers or operate machinery. *Id.* at ¶¶ 45, 46. They also describe that Royal Canin and Tur-Pak paid J&L for plaintiffs' work ($15 per hour and $22.50 in overtime) and that J&L would take deductions to pay WITCC and distribute the rest to plaintiffs. *Id.* at ¶¶ 50, 52.

While there is some discrepancy over who was in charge of work schedules,[6] plaintiffs allege the other defendants deferred to Royal Canin and Tur-Pak regarding the work hours they required from plaintiffs. Plaintiffs also allege that all three defendants had the right to control the nature and quality of the work and that representatives of all three defendants were plaintiffs' direct, on-site supervisors and that plaintiffs reported to Royal Canin, Tur-Pak and/or J&L supervisors. *Id.* at ¶¶ 355-57. They further allege that representatives of all three defendants trained the plaintiffs who worked for them and gave them direction on how to perform work tasks. *Id.* at ¶ 358. Plaintiffs have alleged sufficient facts to allow a reasonable inference that Royal Canin, Tur-Pak and J&L were

---

[6] Plaintiffs allege that they went to Burright, WITCC, and Albrecht to complain about their work schedules, but were told they could not be changed because they were the schedules that Royal Canin or Tur-Pak required. *See* Doc. 76 at ¶¶ 93, 123, 223.

employers or joint employers of plaintiffs. *See Ash v. Anderson Merchandisers, LLC*, 799 F.3d 957, 961 (8th Cir. 2015).

Royal Canin challenges Count II on the additional ground that plaintiffs allege that Royal Canin did pay $22.50 in overtime to J&L, but that J&L failed to distribute that full amount to plaintiffs. Doc. 79 at ¶ 52. Because plaintiffs acknowledge that Royal Canin paid overtime, it argues plaintiffs cannot maintain their FLSA claim based on a failure to pay overtime. Royal Canin also points out that only two (Bucco and Rosa) of the eight plaintiffs who worked at Royal Canin allege they did not receive overtime pay (Doc. 79 at ¶¶ 89, 280), one plaintiff (Melo) fails to allege ever working overtime hours (*Id.* ¶¶ 192-210) and the remaining plaintiffs (Magalhaes, Pinto and Reis) who claim they were owed overtime allege that Royal Canin paid it to J&L, but that J&L failed to distribute the full amount owed. They note that plaintiffs Coutinho and Costa do not make any allegations as to whether they received overtime payments. *Id.* at ¶¶ 105-33, 134-55.

Plaintiffs fail to address this argument in their resistance, except to argue that discovery is necessary to ascertain the exact number of overtime hours each plaintiff worked and on what dates. *See* Doc. 108 at 35-40. The SAC alleges "Defendants Royal Canin, Tur-Pak, and /or J&L failed to pay Plaintiffs all wages due and failed to pay Plaintiffs time and a half for hours exceeding 40 per week." Doc. 79 at ¶ 363. While the SAC acknowledges that Royal Canin made some overtime payments, it also alleges that Royal Canin (as well as the other defendants) failed to pay all wages due.

Royal Canin's argument is better addressed in a motion for summary judgment. At this stage, plaintiffs have sufficiently alleged that defendants Royal Canin, Tur-Pak and J&L failed to pay all wages due in violation of the FLSA. Defendants' motions will be denied as to Count II.

## C. Count III – IWPCL

Plaintiffs allege a violation of the IWPCL against Tur-Pak and J&L. J&L does not seek dismissal of this claim at this time. Tur-Pak relies on the same arguments it

made with regard to Count II – that plaintiffs rely on improper group allegations and do not allege sufficient facts to identify Tur-Pak as an employer. Iowa Code § 91A.5 provides: "an employer shall not withhold or divert any portion of an employee's wages" unless certain exceptions apply. The IWPCL provides that employer means "a person, as defined in chapter 4, who in this state employs for wages a natural person." Iowa Code § 91A.2. For the same reasons stated with regard to Count II, the SAC provides sufficient factual allegations to allow a reasonable inference that Tur-Pak was an employer as defined by the Iowa Code. Tur-Pak's motion will be denied as to Count III.

### D. Count V – Due Process Claims

Plaintiffs have dismissed their due process claims against Royal Canin and Tur-Pak such that WITCC, J&L and the individual defendants remain. In my previous order, I determined that plaintiffs' allegations were insufficient to state due process claims under Article I, section 9 of the Iowa Constitution against the private entity defendants:

> Plaintiffs fail to allege facts to support that actions by Tur-Pak, Royal Canin or J&L were so entwined with State action that they may be fairly treated as actions by the State itself. As noted above, there are no allegations to support a mutual understanding or meeting of the minds between the private entity defendants and the WITCC defendants. While plaintiffs argue they have alleged that defendants worked together in a "scheme" that resulted in the deprivation of plaintiffs' constitutional rights, the allegations in the Factual Background of the FAC or Count VII fail to describe such a scheme or any facts necessary to satisfy the "joint action test," the "symbiotic relationship test," or the "nexus" test. Plaintiffs merely use the collective term "defendants" throughout the FAC. Plaintiffs rely on conclusions and labels, not factual allegations, to support the application of any test that would subject the private entity defendants to liability for a due process violation. *See Ciambriello v. County of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002) ("A merely conclusory allegation that a private entity acted in concert with a state actor does not suffice to state a § 1983 claim against the private entity.").

Doc. 76 at 30-31. With regard to WITCC, I found that plaintiffs' allegations were vague and conclusory and fell short of stating a plausible claim:

24

Plaintiffs have not sufficiently identified the protected liberty or property interest at stake for purposes of either a procedural or substantive due process claim. The only hint of a claimed interest is in their statement that punitive damages are necessary to vindicate their "infringed rights of privacy and/or dignity." *Id.* at ¶ 199. Plaintiffs offer no further explanation in the FAC or their resistances of the nature of the claimed privacy and/or dignity interest or how such an interest was infringed through defendants' alleged actions. Plaintiffs have not alleged that a protected liberty or property interest was involved.

The most substantive allegation in Count VII is that defendants "deprived Plaintiffs of procedural and substantive due process, through policy, practice and/or custom, when recklessly and/or intentionally subjecting them to human and labor trafficking, coercing them to work for Defendants' benefit, isolating and controlling their movements and sources of financial independence, and threatening them with deportation or other punishment as fully detailed above." Doc. 15 at ¶ 194. Plaintiffs do not describe the policy, practice and/or custom in any further detail. Their resistances provide no authority that such actions, if true, could constitute a substantive or procedural due process violation. Thus, with regard to Count VII, plaintiffs' allegations fail to state a plausible claim of a substantive or procedural due process violation against the WITCC defendants.

*Id.* at 32-33.

The J&L defendants argue that plaintiffs' due process claims against them remain deficient because plaintiffs fail to allege state action. Plaintiffs again rely on the joint action test, symbiotic relationship test, and/or nexus test to hold the J&L defendants liable. They argue that WITCC and J&L worked together in a scheme to recruit plaintiffs, place them at Royal Canin and Tur-Pak for hard, manual labor in exchange for providing plaintiffs a nominal education. *See* Doc. 111 at 41-45 (citing Doc. 79 at ¶¶ 26, 40, 45-47, 50, 70-71, 79, 85, 119-20, 171, 331-34, 334, 341-42, 386, 389-93). In describing the scheme, plaintiffs allege that Burright, Albrecht and Albert told plaintiffs about the J-1 visa program, representing that plaintiffs would study at WITCC and complete internships overseen by J&L. They allege that WITCC and J&L assigned them jobs at Royal Canin and/or Tur-Pak and told them they would work no more than 32

25

hours a week. They also allege that WITCC and J&L kept some of plaintiffs' earnings from Royal Canin and Tur-Pak. Plaintiffs also detail specific interactions between individual plaintiffs and representatives of WITCC and J&L. Generally, they allege:

386. Defendants, through their agents, servants and employees in their official capacities, deprived Plaintiffs of procedural and substantive due process through policy, practice, and/or custom, when recklessly and/or intentionally subjecting them to human and labor trafficking, coercing them to work for Defendants' benefit, isolating and controlling their movements and sources of financial independence, withholding moneys due to Plaintiffs from their labor, and threatening them with deportation or other punishment.

388. This deprivation of Plaintiffs' rights resulted from the exercise of a right or privilege having its source in state authority, as WITCC, a state actor, was the sponsor and lead entity in charge of the J-1 Visa Program, under which all Defendants participated in a scheme to deprive Plaintiffs of such rights as described herein.

389. Defendants engaged in a meeting of the minds and mutual understanding to deprive Plaintiffs of their aforementioned rights, each knowing and appreciating what their role was in the scheme – WITCC abusing the J-1 Visa Program and giving the scheme a perceived cover of validity, J&L working with WITCC (first formally and then behind the scenes) to ensure Defendants Tur-Pak and Royal Canin were provided with labor under the guise of a cultural and educational opportunity for Plaintiffs, and Defendants Tur-Pak and Royal Canin knowing, or recklessly disregarding the fact, the labor they received from Plaintiffs was obtained through the means described above.

390. The private Defendants were willful participants in joint activity with WITCC, engaging in pervasive entwinement between themselves and WITCC in the scheme to deprive Plaintiffs of their aforementioned rights.

391. The acts and omissions by J&L, Royal Canin, and Tur-Pak were so entwined with the acts of WITCC that they may be fairly treated as state actions and fairly attributable to the state. Each private actor played an essential role in ensuring the potential success of the scheme.

26

392. A close nexus existed between the private Defendants and WITCC, as well as between WITCC and the deprivation of Plaintiffs' aforementioned rights.

393. Defendants WITCC and J&L, along with their representatives, including the individual Defendants, knowingly and willfully engaged together in recruiting Plaintiffs to the J-1 Visa Program, screening Plaintiffs for acceptance into the J-1 Visa Program, arranging for and transporting Plaintiffs to the United States and to their jobs at Royal Canin and Tur-Pak, placing them in work positions with Royal Canin and Tur-Pak, taking unauthorized deductions from Plaintiffs' paychecks, failing to pay Plaintiffs overtime, and threatening them with abuse of the legal process, including loss of housing, food, educational and work opportunities, and visa revocation.

*Id.* More specifically, they allege:

- Representatives from both J&L and WITCC traveled to Brazil to recruit plaintiffs and make representations to them concerning the program.

- At a meeting with Albrecht and WITCC representatives in Brazil, Albrecht tested whether plaintiff Bucco could lift 25 pounds. Bucco was given a J&L form to fill out at this meeting.

- When Bucco was sick and feverish, WITCC and J&L representatives told Bucco to go to work.

- J&L received plaintiffs' earnings and distributed part of such earnings to WITCC.

- WITCC benefitted by receiving kickbacks for each hour of labor performed by plaintiffs and J&L benefitted by obtaining employees who could not quit or take a sick day for fear of legal repercussions (deportation) and serious physical harm (withholding food and housing).

*Id.* at ¶¶ 26, 47, 50, 71, 85, 332.

"[A] threshold question in due process challenges under [the Iowa] Constitution [is] whether state action is involved." *Putensen v. Hawkeye Bank of Clay Cnty.*, 564 N.W.2d 404, 408 (Iowa 1997) (quoting *Jensen v. Schreck*, 275 N.W.2d 374, 384 (Iowa 1979)). "A state due process clause becomes implicated at the point where the power of

the state is called upon by a private party in such a way as to deprive another of life, liberty or property." *Id.* Iowa courts have determined this point is reached:

> (1) where a state acts directly through its officer or agent; (2) where the state acts in conjunction with business in a profit-making field; (3) where the state by its actions (or inaction) encourages or creates an atmosphere in which private citizens deprive others of their constitutional rights; (4) where the state affirmatively orders or approves the action in the course of its regulatory rule-making; and (5) where functions traditionally performed by the state are delegated to or performed by private interests.

*Id.* (quoting *Jensen*, 275 N.W.2d at 385).

Plaintiffs allege deprivation of their liberty interest in being free from slavery, involuntary servitude and/or peonage and deprivation of their property interest in fair wages for their labor. *See* Doc. 79 at ¶¶ 384-85. WITCC does not challenge that it was a state actor or make any argument that there was insufficient state action. J&L argues there is no allegation that its provision of staffing services is action that can fairly be attributable to WITCC. It contends the SAC alleges that J&L alone placed plaintiffs in positions at Tur-Pak and Royal Canin.

I find that plaintiffs have sufficiently alleged that J&L acted together with WITCC to carry out the J-1 visa program such that J&L's actions may be fairly attributable to WITCC. Plaintiffs allege that both the WITCC and J&L defendants traveled to Brazil to recruit plaintiffs. Doc. 79 at ¶¶ 70-71, 109, 140, 165, 216, 268, 295. Both sets of defendants allegedly met with and made representations to plaintiffs concerning the program. *Id.* at ¶¶ 26, 47, 70-72, 216, 295. Burright told plaintiffs during the recruitment process that J&L would manage their work assignments and how much they earned. *Id.* at ¶¶ 42, 114, 215, 247, 293. Plaintiffs also completed J&L forms at their meetings with Albrecht, during which she also conducted weightlifting tests with plaintiffs. *Id.* at ¶¶ 71-72, 110, 166, 269, 297-98. Later, WITCC instructed plaintiffs to destroy all documents related to J&L and not to mention J&L's involvement during their visa interviews, while also making it apparent to plaintiffs that J&L would be

involved. *Id.* at ¶¶ 36, 74, 141, 167, 218, 251, 271, 300. Plaintiffs were similarly instructed not to mention J&L during their interviews with the State Department or to "say bad things about J&L and not about the college." *Id.* at ¶¶ 57, 152.

Plaintiffs allege they were assigned jobs at Royal Canin or Tur-Pak by WITCC and J&L through Burright and Albrecht. *Id.* at ¶ 40. J&L distributed plaintiffs' earnings and made distributions to WITCC. *Id.* at ¶ 50. Both J&L and WITCC are alleged to have threatened plaintiffs into continued work. *Id.* at ¶ 85, 92, 226, 256, 282, 311. In sum, plaintiffs allege that the WITCC and J&L defendants worked together to carry out the program. WITCC essentially assigned the "internship" aspect of the program to J&L, knowing and acquiescing in the intent to have plaintiffs work manual labor jobs at Royal Canin and Tur-Pak. *See Putensen*, 564 N.W.2d at 408 (state action is found when the state acts in conjunction with business in a profit-making field or where the state, by its actions, encourages or creates an atmosphere in which private citizens deprive others of their constitutional rights). Plaintiffs have sufficiently alleged that WITCC acted in conjunction with J&L such that J&L's actions may be fairly attributable to the state actor and subject to Iowa's due process clause.

Plaintiffs allege both procedural and substantive due process claims under Article I, section 9 of the Iowa Constitution. To state a claim of procedural due process, plaintiffs must show an impairment of an interest in life, liberty or property by government action. *Behm v. City of Cedar Rapids*, 922 N.W.2d 524, 566 (Iowa 2019). "Once a protected interest has been established, the next question is what procedural minima must be provided before the government may deprive the complaining party of the protected interest." *Id.* (citing *In re C.M.*, 652 N.W.2d 204, 212 (Iowa 2002)). Plaintiffs have failed to state a claim of procedural due process because they do not allege that the deprivations at issue were violations simply because they were not afforded adequate process. *See* Doc. 79 at ¶¶ 381-98. To the extent they do make such allegations, they are vague, conclusory and merely recite the elements of a procedural due process claim without factual support. *See id.* at ¶ 387 ("Defendants deprived Plaintiffs of their rights

29

without notice and opportunity to be heard."). Plaintiffs fail to identify the notice or procedure that was not followed, nor could they, because plaintiffs are not arguing that any procedure, such as a notice or hearing, would have remedied the alleged deprivations. Therefore, I find plaintiffs' due process claim is limited to consideration of substantive due process.

Article I, section 9 of the Iowa Constitution provides: "no person shall be deprived of life, liberty, or property, without due process of law." "[A] violation of substantive due process may arise from government action that 'shocks the conscience.'" *Behm*, 922 N.W.2d at 550 (quoting *Zaber v. City of Dubuque*, 789 N.W.2d 634, 640 (Iowa 2010)). The Iowa Supreme Court has held that the State of Iowa and state officials acting in their official capacities may be sued directly for a violation of Article I, section 9 of the Iowa Constitution if the Iowa legislature does not provide an adequate remedy. *Godfrey v. State of Iowa*, 898 N.W.2d 844, 846-47 (Iowa 2017) (majority opinion); *id.* at 880-81 (Cady, C.J., concurring in part and dissenting in part) ("I concur in the opinion of the court to the extent it would recognize a tort claim under the Iowa Constitution when the legislature has not provided an adequate remedy."). Plaintiffs allege that WITCC deprived them of substantive due process "through policy, practice, and/or custom, when recklessly and/or intentionally subjecting them to human and labor trafficking, coercing them to work for defendants' benefit, isolating and controlling their movements and sources of financial independence, withholding moneys due to plaintiffs from their labor, and threatening them with deportation or other punishment." *See* Doc. 79 at ¶ 386.

WITCC argues plaintiffs have failed to satisfy the requirements to bring a *Godfrey* claim under Iowa's due process clause. First, it argues that plaintiffs have failed to identify a sufficient interest. Second, it argues plaintiffs fail to explain how they were denied the interest in "being free from slavery." Additionally, in accordance with *Godfrey*, WITCC argues that the Iowa Civil Rights Act (ICRA) provides an adequate, alternative legal remedy for the harm plaintiffs allege. Finally, it argues there are other

30

common law and statutory claims for relief, as evidenced by plaintiffs' other claims. I will address these last two arguments first.

On the issue of whether there are other adequate remedies for plaintiffs' complaints,[7] WITCC argues that prior Iowa holdings[8] and comparable holdings from other state courts[9] demonstrate that either the ICRA or other remedies are sufficient. Plaintiffs argue they have not asserted discrimination claims covered by the ICRA and that other remedies would be insufficient to vindicate plaintiffs' rights to be free from slavery or involuntary servitude, which are rooted in Article I, section 23 of the Iowa Constitution.[10]

---

[7] WITCC does not address whether an Iowa statute sufficiently addresses plaintiffs' alleged property interest in "fair wages" or overtime payments, which is understandable given that WITCC is not alleged to be plaintiffs' employer, at least during the relevant time. J&L, however, did argue that plaintiffs' wage claims are properly addressed by statute rather than the Iowa Constitution. I agree. The Iowa legislature has identified an adequate remedy for plaintiffs' claim in the IWPCL. Therefore, I will consider only plaintiffs' alleged liberty interest in addressing whether plaintiffs have a substantive due process claim under the Iowa Constitution.

[8] WITCC cites *Van Baale v. City of Des Moines*, 550 N.W.2d 153, 157 (Iowa 1996), in which the court stated "[e]qual protection rights may be enforced only if the Congress *or* a legislature provides a means of redress through appropriate legislation." It acknowledges that *Van Baale* was abrogated by *Godfrey* to the extent *Godfrey* recognized that certain constitutional provisions could be self-executing, but contends *Van Baale* is still relevant because the Iowa Supreme Court has implied that the avenues to redress to constitutional wrongs can include either federal or state statutes.

[9] WITCC cites various state court opinions in which courts have found other adequate remedies in either state statutes or common law. *See Katzberg v. Regents of Uni. of California*, 58 P.3d 339, 356 (Cal. 2002) (concluding plaintiff had adequate remedies for an alleged violation of his liberty interest by requesting a "name-clearing hearing" provided by statute or pursuing a defamation action); *Bd. of Cnty. Comm'rs of Douglas Cnty. v. Sundheim*, 926 P.2d 545, 553 (Colo. 1996) (concluding there was a sufficient statutory remedy for challenging a zoning determination); *Augat v. State*, 244 A.D.2d 835, 838 (N.Y. App. Div. 3d 1997) ("we find that each of claimants' constitutional torts allegations may be analogized to an existing common-law tort for which there are adequate alternate remedies.").

[10] "There shall be no slavery in this state; nor shall there be involuntary servitude, unless for the punishment of a crime." Iowa Const., Art. 1, § 23.

I agree with plaintiffs that the ICRA is not an adequate remedy because plaintiffs are not alleging a claim of discrimination. With regard to whether an adequate remedy must be provided by the Iowa legislature or can come in other forms (such as federal statute or common law), then-Chief Justice Cady (who casted the deciding vote in the plurality opinion) stated: "I concur in the opinion of the court to the extent it would recognize a tort claim under the Iowa Constitution when *the legislature* has not provided an adequate remedy." *Godfrey*, 898 N.W.2d at 880 (Cady, C.J., concurring in part and dissenting in part) (emphasis added). In *Godfrey*, the issue was whether the ICRA provided that remedy. WITCC argues "the legislature" extends behind Iowa statutes but does not provide any authority other than from states who have rejected a direct constitutional claim by finding adequate remedies in state statutes or common law claims. *See supra* n.7. Plaintiffs do not address this argument, except to argue that their other claims are not based on a right to be free from slavery or involuntary servitude.

In the absence of any clarification from Iowa courts on the meaning of "the legislature," I will look to *Godfrey* itself. There, the plaintiff argued there was no statute *or* common law tort that would provide him with complete relief. *Godfrey*, 898 N.W.2d at 849. He cited *Bivens*, in which the United States Supreme Court noted that the interests in state tort laws and those protected by the Fourth Amendment may be "inconsistent or even hostile." *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 394 (1971) (comparing remedies for trespass by a private citizen as opposed to a federal law enforcement official demanding entry). The defendants in *Godfrey* argued that recognizing a direct cause of action for violations of the due process clause of the Iowa Constitution would violate separation of powers because the enabling clause grants the power to enact laws in order to effectuate the Iowa Constitution to the legislature. *Godfrey*, 898 N.W.2d at 850-51. The Court discussed *Bivens*, in which the Supreme Court concluded that it possessed the authority to create an action for damages for five reasons. *Id.* at 852. The *Godfrey* Court then went on to discuss later cases involving direct causes of action for damages under the United States Constitution. It

32

noted that in *Passman*, the Court stated that "were Congress to create equally effective alternative remedies, the need for damages relief might be obviated." *Davis v. Passman*, 442 U.S. 228, 248 (1979). In *Carlson*, the Court articulated that a plaintiff has a right to recover damages for a constitutional violation except when (1) there are "special factors counseling hesitation in the absence of [an] affirmative action by Congress" or (2) Congress has already "provided an alternate remedy which it explicitly declared to be a *substitute* for a recovery directly under the Constitution and viewed as equally effective." *Carlson v. Green*, 446 U.S. 14, 18-19 (1980) (emphasis in original).

The *Godfrey* Court then discussed state court cases that considered whether state constitutional provisions were self-executing for purposes of actions for money damages. It noted those cases also commented on the lack of a statute providing an adequate remedy and, thus, recognized actions for money damages under their state constitutions. *See Dorwart v. Caraway*, 58 P.3d 128, 133 (Mont. 2002); *Brown v. State*, 674 N.E.2d 1129, 1137 (N.Y. 1996) and *Corum v. Uni. of N.C.*, 413 S.E.2d 276 (N.C. 1992). As the *Godfrey* court noted, the *Dorwart* court, relying on *Bivens*, "rejected the argument that common law remedies were sufficient, noting that common law causes of action intended to regulate the relationships among and between individuals are not adequate to redress the type of damage caused by the invasion of constitutional rights." *Godfrey*, 898 N.W.2d at 860 (citing *Dorwart*, 58 P.3d at 137).

*Godfrey* reflects that the Court considered whether common law remedies would be adequate. While the Court did not directly address whether a common law remedy would be adequate (likely because the case concerned application of the ICRA), it implied that it would not by referring solely to remedies provided by "the legislature." Given the history cited by the *Godfrey* Court, and absent any authority from Iowa courts to the contrary, I take *Godfrey*'s holding to mean what it says – that a tort claim under the Iowa Constitution is permissible when "the legislature" has not provided an adequate remedy. Therefore, I decline to dismiss plaintiffs' substantive due process claim under Article I,

section 9 of the Iowa Constitution on the basis of an allegedly-adequate remedy under a federal statute or common law.

WITCC's other arguments for dismissal - that plaintiffs have failed to identify a sufficient interest and to explain how they were denied the interest in "being free from slavery" – are unpersuasive. Plaintiffs have identified their liberty interest as "being free from slavery" or involuntary servitude as provided in Article I, section 23 of the Iowa Constitution. With regard to "how" they were allegedly denied this interest, plaintiffs have provided sufficient factual allegations. *See, e.g.*, Doc. 79 at ¶ 386 (describing recklessly and/or intentionally subjecting them to human and labor trafficking, coercing them to work for defendants' benefit, isolating and controlling their movements and sources of financial independence, withholding moneys due to plaintiffs from their labor, and threatening them with deportation or other punishment). WITCC has provided no other bases for dismissal at this time. As such, defendants' motion as to Count V will be granted in part and denied in part. It will be granted as to plaintiffs' procedural due process claim and as to their substantive due process claim based on a deprivation of a property interest in "fair wages." It will be denied as to plaintiffs' substantive due process claim under Article I, section 9 of the Iowa Constitution based on an alleged deprivation of their liberty interest.

### E.    *Count VI – Fraudulent Misrepresentation*

Defendants argue plaintiffs have not pled this claim with sufficient particularity as required under Fed. R. Civ. P. 9(b). The WITCC defendants argue the SAC lacks any specific facts that could establish scienter or an intent to defraud. They contend there is a lack of allegations that WITCC knew its representations to plaintiffs were false and that it intended to deceive plaintiffs with such knowing misrepresentations. The J&L defendants argue the only alleged representations they made were related to the number of hours plaintiffs would work and that plaintiffs have not alleged that those

representations were material or that they relied on such representations when deciding to participate in the J-1 visa program.

Plaintiff's point out that malice, intent, knowledge and other conditions of a person's mind may be alleged generally under Rule 9(b). They cite multiple paragraphs from the SAC and the elements of fraudulent misrepresentation that each paragraph satisfies. *See* Doc. 110 at 45-49. They argue that references to multiple defendants throughout those paragraphs are not shotgun allegations, but allegations that specifically identify who made the alleged misrepresentations

Fraudulent misrepresentation requires proof of: (1) a representation; (2) falsity; (3) materiality; (4) scienter; (5) intent; (6) justifiable reliance; and (7) resulting injury. *See Smidt v. Porter*, 695 N.W.2d 9, 22 (Iowa 2005). Federal Rule of Civil Procedure 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." This means a plaintiff must identify the "who, what, when, where, and how: the first paragraph of any newspaper story." *See Great Plains Trust Co. v. Union Pac. R. Co.*, 492 F.3d 986, 995 (8th Cir. 2007) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.), *cert. denied*, 498 U.S. 941 (1990)). "Conclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule." *BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 917 (8th Cir. 2007) (quoting *Commercial Property Invs. Inc. v. Quality Inns Int'l Inc.*, 61 F.3d 639, 644 (8th Cir. 1995)).

Plaintiffs allege the following facts related to scienter and intent to defraud:

334.   Defendants knowingly placed Plaintiffs in unskilled labor positions, which are not permitted under the J-1 Visa Program requirements, rather than placing them in internships.

337.   Defendant Burright made repeated statements that the business affiliates which J&L and/or WITCC would be partnering with (presumably, Royal Canin and Tur-Pak) were lacking sufficient numbers of workers.

35

410. Defendants knew the representations about WITCC's J-1 Visa Program were false.

411. Defendants intended to deceive Plaintiffs to apply and participate in the J-1 Visa Program, which included Plaintiffs leaving behind family, jobs, pets, and lives in their home country

Plaintiffs also allege in several paragraphs that they were instructed by WITCC representatives to discard any documents mentioning J&L and instructed not to use the word "work" in their visa interview, but to state they were participating in an internship arranged directly with third parties. *See* Doc. 79 at ¶¶ 74, 117, 167, 251, 271.

Plaintiffs identify defendants' false representations as:

- WITCC's federal J-1 visa program was a cultural exchange study program in which they would study and work at a job related to their field of study for a period of two years.

- WITCC's federal J-1 visa program was a way for plaintiffs to earn a two-year degree in culinary arts or robotics and automation and a letter of recommendation and/or a job upon returning to Brazil

- Plaintiffs would not be responsible for costs of tuition, housing, food, transportation and school/work supplies

- Plaintiffs would work no more than 32-40 hours per week as part of the J-1 Visa Program

*Id.* at ¶¶ 400-03. Plaintiffs allege these representations were false because plaintiffs' jobs held no educational value and were unrelated to their field of study; they did not receive two-year degrees, letters of recommendation or jobs; were not provided adequate food or school/work supplies; had their housing prematurely terminated; and regularly worked more than 40 hours per week.

To the extent defendants are arguing plaintiffs have failed to allege defendants knew the representations were false at the time they were made, that may be true with regard to some of the representations. While plaintiffs generally allege that defendants

36

"knew the representations about WITCC's J-1 Visa Program were false," plaintiffs do not allege that defendants knew, at that time they made the statements, that plaintiffs would be working more than 40 hours per week, would not receive degrees, job recommendations or jobs or that plaintiffs would end up bearing at least some costs of tuition, housing, food, transportation and school/work supplies. Plaintiffs do, however, allege that defendants knowingly placed plaintiffs in unskilled labor positions, which are not permitted under the J-1 visa program requirements, rather than placing them in internships related to their fields of study. *See id.* at ¶ 334.

Other allegations also allow a strong inference of defendants' knowledge of falsity concerning the type of work plaintiffs would be assigned. These include Burright's alleged statements about the business affiliates' needs for workers and Albrecht's weight-lifting tests and questions during the interview process. *See id.* at ¶¶ 71, 110, 337. These allegations suggest that WITCC and J&L knew, when they were recruiting plaintiffs and making representations about the J-1 visa program, that plaintiffs would be performing unskilled, manual labor rather than working in internships related to their field of study. The SAC contains sufficient factual allegations of intent and scienter under Rule 9(b).

With regard to the J&L defendants' arguments that the SAC fails to identify any representations they made, plaintiffs identify the following:

> 26. Representatives of Defendants WITCC and J&L, including Defendants Burright (International Education Institute Specialist at WITCC), Albrecht (J&L Account Executive), and Albert (WITCC Vice-President) told Plaintiffs that the federal J-1 Visa Program at WITCC was a two-year program in which Plaintiffs would study at WITCC and complete internships overseen by J&L which would be related to their field of study and at which they would work no more than 32 hours per week.

Doc. 79. They also cite paragraphs alleging that in approximately April/May 2019, or during the recruitment and application process, representatives from WITCC, including Defendants Albert, Murrell, Castro and Burright, as well as Defendant Albrecht from J&L met with plaintiffs and other potential J-1 students at the Windsor Granabara Hotel

Case 5:21-cv-04001-LTS-KEM   Document 126   Filed 03/01/22   Page 37 of 47

in Rio de Janeiro, told them that robotics and culinary arts students would work in an area related to their field of study and that they would have a maximum weekly workload of 40 hours. *See id.* at ¶¶ 109, 214, 401, 403. Additionally, they cite the same representations identified above from paragraphs 400 through 403.

The SAC contains sufficient allegations that the J&L defendants made false representations to plaintiffs. These representations extend beyond the number of hours plaintiffs were expected to work, as they concern representations about the "internships" related to their field of study as part of the program. As noted above, plaintiffs have sufficiently alleged that defendants knew these statements were false when they were made. They have also sufficiently alleged that these representations were material and that plaintiffs justifiably relied on them. *See* Doc. 79 at ¶¶ 75, 116, 217, 409, 412. Defendants' motions as to Count VI will be denied.

## F. *Count VII – Unjust Enrichment*

Royal Canin raises a successive motion to dismiss this claim based on new allegations in the SAC that, it argues, demonstrate that it paid full compensation for the hours worked. A claim of unjust enrichment requires proof that (1) the recipient was enriched by the receipt of the benefit; (2) the enrichment was at the expense of the provider; and (3) it is unjust to allow the recipient to retain the benefit under the circumstances. *Waldner v. Carr*, 618 F.3d 838, 848 (8th Cir. 2010). Plaintiffs allege defendants were unjustly enriched because they did not fully compensate plaintiffs for the hours they worked, withheld portions of compensation due and/or received a portion of plaintiffs' compensation to which they were not entitled. Doc. 79 at ¶ 419. They also allege defendants withheld secret deductions from plaintiffs' wages. *Id.* at ¶ 420.

Royal Canin argues the SAC alleges that it paid $15 per hour for plaintiffs' labor and $22.50 per hour in overtime. Doc. 79 at ¶¶ 50, 52. It contends that plaintiffs do

38

not allege that Royal Canin withheld compensation or made secret deductions.[11]  Royal Canin argues that any allegations that it benefitted from plaintiffs' labor are maintained in improper group pleading or conclusory statements and that plaintiffs allege other defendants engaged in threats to force plaintiffs into working and refusing to let them take sick days.

Plaintiffs argue I should not consider Royal Canin's motion as to this claim because it constitutes an impermissible "second bite of the apple" and would be prejudicial.  They cite Federal Rule of Civil Procedure 12(g)(2), which states: "Except as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion."  Plaintiffs also contend that the basis on which Royal Canin seeks dismissal is inaccurate because, they argue, Royal Canin benefitted from plaintiffs' labor, knowingly participated in the wrongful withholding of money from their paychecks, received the benefit of plaintiffs' hard physical and manual labor at a discount compared to what it paid plaintiffs' American co-workers and received the benefit of guaranteed workers who could not quit or take a sick day without fear of retaliation.

I agree with Royal Canin that the SAC makes new allegations relevant to this claim against Royal Canin that constitute a new basis for a Rule 12(b)(6) motion that was not previously available to Royal Canin.  As such, I do not find the motion to be procedurally barred under Rule 12(g)(2).  However, I do not find the motion to be meritorious.  While some of plaintiffs' allegations would appear to undercut their claim of unjust enrichment as to Royal Canin (such as admitting that Royal Canin did pay overtime and that J&L withheld portions of plaintiffs' compensation), Royal Canin makes the leap that these allegations establish that Royal Canin fully compensated plaintiffs.  That is contrary to what plaintiffs allege.  *See* Doc. 79 at ¶ 419 ("Defendants benefitted from Plaintiffs' work because they did not fully compensate Plaintiffs for their hours, withheld portions

---

[11] Plaintiffs make such allegations against "defendants" generally.  *See* Doc. 79 at ¶ 420.

39

of compensation due Plaintiffs, and/or received a portion of Plaintiffs' compensation which they were not entitled to."). Royal Canin has essentially raised a defense that is better addressed by a motion for summary judgment. Royal Canin's motion as to Count VII will be denied.

### G. Count IX - Tortious Infliction of Emotional Distress

J&L and WITCC argue plaintiffs have not cured the defects from their FAC as to this claim. They contend plaintiffs rely on the same formulaic recitation of the elements and conclusory allegations failing to allege the conduct that is outrageous and identify the defendants engaged in such conduct. They argue plaintiffs have suggested only minor distress, such as being tired, fatigued, anxious, exhausted, humiliated, stressed and worried due to working in a manufacturing facility. They also argue plaintiffs fail to allege physical injuries as a result of their emotional distress as required under Iowa law.

A plaintiff must prove the following elements to prevail on a claim of intentional[12] infliction of emotional distress under Iowa law:

    (1)    outrageous conduct by the defendant;

    (2)    the defendant intentionally caused, or recklessly disregarded the probability of causing, the emotional distress;

    (3)    plaintiff suffered severe or extreme emotional distress; and

    (4)    the defendant's outrageous conduct was the actual and proximate cause of the emotional distress.

*Barreca v. Nickolas*, 683 N.W.2d 111, 123 (Iowa 2004) (quoting *Fuller v. Local Union No. 106*, 567 N.W.2d 419, 423 (Iowa 1997)). Outrageous conduct is conduct that is "so

---

[12] *See Northrup v. Farmland Indus., Inc.*, 372 N.W.2d 193, 197 (Iowa 1985) (noting that while Iowa cases refer to this claim as an "intentional infliction of emotional distress," neither the Restatement nor Iowa case law requires proof of an intentional act; a "reckless disregard of the probability of causing" emotional distress is enough).

extreme in degree as to go beyond all possible bounds of decency" and is "regarded atrocious, and utterly intolerable in a civilized community." *Id.* "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor and lead him to exclaim, "Outrageous!" *Smith v. Iowa State University of Sci. and Tech.*, 851 N.W.2d 1, 26 (Iowa 2014) (quoting *Van Baale v. City of Des Moines*, 550 N.W.2d 153, 156-57 (Iowa 1996)). "[I]t is for the court to determine in the first instance, as a matter of law, whether the conduct complained of may reasonably be regarded as outrageous." *Smith*, 851 N.W.2d at 26 (quoting *Vinson v. Linn-Mar Cmty. Sch. Dist.*, 360 N.W.2d 108, 118-19 (Iowa 1984)). "Where reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability." *Id.* (quoting Restatement (Second) of Torts § 46, cmt. *h*, at 77 (1965)).

Extreme emotional distress requires a plaintiff to "establish more than the fact that they felt bad for a period of time." *Ette ex rel. Ette v. Linn-Mar Cmty. Sch. Dist.*, 656 N.W.2d 62, 71 (Iowa 2002) (internal quotation marks and citation omitted). There must be "direct evidence of either physical symptoms of the distress or a clear showing of a notably distressful mental reaction caused by the outrageous conduct." *Smith*, 851 N.W.2d at 30 (internal quotation marks and citation omitted). *Compare Northrup v. Miles Homes, Inc. of Iowa*, 204 N.W.2d 850, 855-60 (Iowa 1973) (describing abdominal pains and cramps, losing 40 pounds, receiving medication for her nerves, multiple breakdowns and vomiting in public as sufficient evidence to generate a jury question) *with Pousen v. Russell*, 300 N.W.2d 289, 297 (Iowa 1981) (evidence that plaintiff "was very, very down," "was feeling super badly" and "felt he lost everything" during a month or two-month time period was insufficient evidence of extreme emotional distress).

"When evaluating claims of outrageous conduct arising out of employer-employee relationships, we have required a reasonable level of tolerance. Every unkind and inconsiderate act cannot be compensable." *Smith*, 851 N.W.2d at 26 (quoting *Vaughn*

41

*v. Ag Processing, Inc.*, 459 N.W.2d 627, 636 (Iowa 1990)).  In determining whether conduct is outrageous "the court should consider the relationship between the parties" such as whether the conduct arises "from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests." *Vinson*, 360 N.W.2d at 118 (quoting Restatement (Second) of Torts § 46, comment e (1965)).  "It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort." *Id.*

In my previous order, I found plaintiffs' allegations were nothing more than a formulaic recitation of the elements.  The FAC lacked factual allegations concerning the alleged unlawful acts and omissions that were extreme and outrageous and did not incorporate by reference other acts referenced throughout the FAC.  They also did not identify which defendants engaged in which conduct or facts related to the alleged harm plaintiffs suffered beyond conclusory allegations.  *See* Doc. 76 at 45.

Plaintiffs argue they have sufficiently pled details to put each defendant on notice as to how or why each defendant's conduct was outrageous.  They cite multiple paragraphs throughout the SAC describing how plaintiffs were recruited, the defendants' representations to them, their working conditions, defendants' threatening statements to them and defendants' conduct regarding plaintiffs' wages.  Doc. 79 at ¶¶ 26, 28, 30-32, 34-37, 40, 43-45, 47-49, 50, 52-55, 57, 59, 61-62, 71, 79-80, 83, 85-87, 109-10, 119-20, 125, 143, 179, 202, 226, 256-57, 278, 308, 331-32, 334, 341, 363, 369, 373-75, 386, 405-07, 433-34.  Some allegations refer to all defendants while others refer to specific defendants.  Plaintiffs argue that the outrageous conduct was not the working conditions, but the means by which plaintiffs were deceived and threatened into working in those conditions.  Plaintiffs also cite paragraphs relevant to allegations of emotional distress, including physical manifestations.  *See id.* at ¶¶ 94, 98, 103, 124, 126, 130-33,

144, 149, 155, 176, 188, 191, 205, 224-25, 234, 238-39, 253, 263, 290, 313-14, 329, 435-36 (discussed in detail below).

Plaintiffs' tortious infliction of emotional distress claim fails on the third and fourth elements: severe or extreme emotional distress and that defendants' outrageous conduct was the actual and proximate cause of the emotional distress. As demonstrated by plaintiffs' allegations below, they either fail to allege physical symptoms or extreme emotional distress that rises to the level recognized under Iowa law[13] or they fail to allege that J&L's and WITCC's conduct caused their emotional distress. For instance, many plaintiffs allege physical symptoms or emotional distress due to their working conditions.

**Bucco**

- "fearful of not finishing the program and as a result being unable to find a job back in Brazil." *Id.* at ¶ 94.

- Felt "helpless, exploited, humiliated, fatigued and undervalued due to the long hours of manual labor that had nothing to do with her field of study" and "suffered physical and mental exhaustion and had trouble concentrating in class." *Id.* at ¶

---

[13] *See, e.g.*, *Steckelberg v. Randolph*, 448 N.W.2d 458, 462 (Iowa 1989) ("Our cases that have found substantial evidence of emotional harm have had direct evidence of either physical symptoms of the distress or a clear showing of a notably distressful mental reaction caused by the outrageous conduct."). Iowa courts have relied on the Restatement (Second) of Torts for guidance, which provides:

> Emotional distress passes under various names, such as mental suffering, mental anguish, mental or nervous shock, or the like. It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea. It is only where it is extreme that the liability arises. Complete emotional tranquility is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it. The intensity and the duration of the distress are factors to be considered in determining its severity. Severe distress must be proved; but in many cases the extreme and outrageous character of the defendant's conduct is itself important evidence that the distress has existed.

Restatement (Second) of Torts § 46 cmt. *j*, at 77-78.

103.

- She was "in despair" about what she had given up to participate in the program and was "abandoned and uncertain about her future." *Id.*

### Coutinho

- complained how "physically demanding the work was and told [Burright] he was exhausted." *Id.* at ¶ 124.

- "suffered physical and mental exhaustion from long hours of manual labor and was unable to sleep due to anxiety over the forced labor and lack of promised educational opportunity." *Id.* at ¶ 130.

- When the J&L van arrived each day to pick him up for work, his "heart raced, he became anxious and experienced despair knowing how physically difficult his shift would be" and that he "experienced hand tremors and lost 45 pounds in just four months." *Id.* at ¶ 131.

### Costa

- "became so exhausted from overwork" and "had trouble studying and staying awake in class." *Id.* at ¶ 144.

- felt "exhausted, angry, sad, manipulated, and trapped." *Id.* at ¶ 155.

### Magalhaes

- suffered "extreme cold, blood pressure difficulties, dry skin, and pain and injury in his arm. Psychologically, he found the work demeaning, degrading, and disappointing, as well as physically difficult." *Id.* at ¶ 176.

- "could not sleep for fear of retaliation and worry about WITCC's claim that he had signed a document that allowed WITCC to confiscate his passport." *Id.* at ¶ 188.

- "felt deceived, abandoned, betrayed, unprotected in a foreign country, and desolate because of all that he had given up and sacrificed to participate in the program, which was not at all as Defendants had promised." *Id.* at ¶ 191.

- "exhausted and stressed from the long hours of manual labor at Royal Canin, which affected his ability to study." *Id.*

*Melo*

- did not have sufficient food and suffered hunger. *Id.* at ¶ 205.

*Pinto*

- work at Royal Canin was so "physically difficult that he often felt nauseated and ill." *Id.* at ¶ 224.

- "would often work 12 days in a row and would work double shifts on weekends" and "was exhausted but only slept three hours per night." *Id.* at ¶ 225.

- instructed to seek out food pantries for hand-outs, which "caused him shame" and was "embarrassed and distressed to accept charity when WITCC had promised to provide him with food." *Id.* at ¶ 234.

- suffered "fear, exhaustion, stress, loss of dignity, and anxiety due to the harsh working conditions and the subsequent lack of employment which left him financially destitute." *Id.* at ¶ 238.

- "consults with a psychologist to address his mental and emotional pain and suffering" and still suffers "sleeplessness, weakness, and depression as a result of the aforementioned events." *Id.* at ¶ 239.

*Reis*

- alleges his nose bled and he experienced "extreme fatigue due to the hard labor and long hours working at Royal Canin" and experienced "helplessness, frustration, and despair due to the poor working conditions." *Id.* at ¶¶ 253, 263.

- "felt cheated, humiliated, and ashamed that he had been misled by Defendants." *Id.*

*Rosa*

- alleges he "felt helpless" because of the poor living conditions, hard physical labor, and lack of the educational and training opportunities that he had been promised. *Id.* at ¶ 290.

*Soares*

- alleges she frequently suffered from colds and flu "due to the freezing work

45

environment and her lack of appropriate protective clothing." *Id.* at ¶ 313.

- "suffered physical and mental fatigue from the long hours of labor to the point that she missed classes and could not study properly." *Id.* at ¶ 329.

- "felt cheated" by defendants "isolated and neglected, and has suffered psychological damage, for which she tried to get help from a WITCC psychologist." *Id.*

- feelings of "guilt, anger, anguish, and anxiety caused by the adverse working conditions and how the program had been misrepresented to her caused her sleeplessness and despair" and she continues to suffer "panic attacks and nervousness due to Defendants' conduct." *Id.*

None of the plaintiffs have alleged factual allegations constituting severe or extreme emotional distress that was actually and proximately caused by J&L's and WITCC's alleged outrageous conduct. While some plaintiffs have sufficiently alleged severe or extreme emotional distress, they fail to allege that such distress was caused by J&L's or WITCC's conduct, instead attributing it to their working conditions. Because plaintiffs have failed to include factual allegations that, if accepted as true, would satisfy both of these elements, defendants' motion as to Count IX will be granted.

## V. CONCLUSION

For the reasons set forth herein, defendants' motions (Docs. 87, 90, 93, and 98) to dismiss are **granted** in part and **denied** in part, as follows:

1. The motions are **denied** as to Count I (against the WITCC and J&L defendants), Count II, Count III, Count V (substantive due process claim based on alleged liberty interest), Count VI and Count VII.

2. The motions are **granted** as to Count I (against Royal Canin and Tur-Pak), Count V (procedural due process claim and substantive due process claim based on alleged property interest) and Count IX.

3. The following claims remain against the following defendants:

46

- Count I – TVPRA claims (against the WITCC and J&L defendants)
- Count II – FLSA claims (against Royal Canin, Tur-Pak and J&L)
- Count III – IWPCL claims (against Tur-Pak and J&L)
- Count V – Substantive Due Process claims under the Iowa Constitution based on alleged liberty interests (against the WITCC and J&L defendants)
- Count VI – Fraudulent Misrepresentation claims (against the WITCC and J&L defendants)
- Count VII – Unjust Enrichment claims (against all defendants)

**IT IS SO ORDERED.**

**DATED** this 1st day of March, 2022.

_____

Leonard T. Strand, Chief Judge